**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Elsa RAMOS and Jairo Ramos,
Defendants–Appellants.**

**Nos. 90–2383, 90–2470.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 15, 1991.

Decided May 8, 1991.

Edward G. Kohler, Barry R. Elden, and Lisa Huestis, Asst. U.S. Attys., Office of the United States Attorney, Criminal Receiving, Appellate Div., Chicago, Ill., for the U.S.

John A. Meyer, Chicago, Ill., for Elsa Ramos.

Richard R. Mottweiler, Chicago, Ill., for Jairo Ramos.

Before WOOD, JR., and KANNE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

HARLINGTON WOOD, JR., Circuit Judge.

A "reverse buy" netted three defendants, all of whom were convicted. Two of the defendants, Elsa and Jairo Ramos, filed appeals that were consolidated by this court. For the following reasons, we affirm the rulings that they challenge.

## I.

### A. *Factual Background*

On November 6, 1989, Benny Perez paged Jose Olivier and attempted to arrange a narcotics purchase. There are two notable twists, however, to the otherwise

standard scenario. First, Perez was calling from Miami to purchase cocaine from a Chicago source. Second, Olivier was acting as a special undercover agent for the FBI.

Satisfied that a deal could be arranged, Perez flew to Chicago on November 7, 1989, in the company of Elsa Ramos. On arrival, they were greeted by the family of Elsa's brother, Jairo Ramos, who had come to pick them up at the airport.[1] Both Elsa and Perez became guests at Jairo's home.

Later that evening, Perez paged Olivier and made tentative arrangements to meet the next day.[2] Several telephone conversations later, the two men agreed to meet at a gas station. A third person, Perez's partner, waited nearby while that meeting took place. Perez mentioned that person's presence but did not disclose his location, simply stating that "he is waiting." Perez then told Olivier that he was prepared to buy five kilograms of cocaine per week and that he would pay $85,000 for the first five kilograms.

The two men also discussed the mechanics of the proposed transaction. Perez wanted a portion of the deal to take place in a house. Olivier would not agree to meet in a house, however. The two men agreed to find a different location and their meeting ended.

After conducting countersurveillance, Perez got into the passenger side of a maroon Corsica. FBI surveillance agents observed that the driver of the automobile was a Hispanic male, but no further identification was made. The Corsica, which was registered to Jairo and his wife, was observed in front of Jairo's home about an hour and a half later.

Later that same afternoon, Perez and Olivier had another conversation about where the deal should take place. Perez told Olivier that "the people" told him not to do the transaction in the street or riding around. Perez also stated that he did not presently have the money in his possession, and that the person with the money kept it "at his house." Olivier remained steadfast in his refusal to conduct the transaction in a house, however, and the two men ended their discussion without reaching an agreement.

Perez made numerous attempts to contact Olivier over the next four days, but Olivier did not return these calls until November 13. Perez was by this time quite anxious to deal, and the two men resumed negotiations. They had a telephone conversation the next morning and agreed to meet near a medical center. From there, they would go to a nearby park and "finish everything."

As agreed, Olivier met Perez at a pay phone near the medical center. He then asked to see the money before making the exchange. Perez told him to wait for a moment, walked into the medical center, and returned shortly thereafter with Jairo and Elsa Ramos.

Elsa, who was carrying a duffel bag that belonged to Jairo's wife, went directly to a maroon Corsica and got in on the driver's side. Jairo and Perez met with Olivier near the pay phone and Perez told Olivier that the money was in the Corsica with Elsa. Olivier got into the Corsica on the passenger's side and asked Elsa if the bag she had been carrying was "it." After she responded affirmatively, Olivier opened the bag and examined the currency inside. He then got out of the car and went back to talk with Jairo and Perez, who agreed to complete the transaction in a nearby Sears parking lot.

---

1. Jairo's wife testified that she purchased a one-way ticket on November 4, 1989, so that Elsa might come from Florida and assist her in caring for her baby while she was undergoing some physical problems. Elsa delayed her flight several times, however, apparently so that she could travel with Perez.

2. Perez had obtained Olivier's pager number from an informant in Miami who was using the name Armando. Armando told Perez the price and quantity of cocaine that he could buy from Olivier and described how the transaction would take place.

This conversation between Perez and Olivier, as well as many of the others that occurred during the investigation, was recorded and subsequently translated from Spanish into English.

Olivier got into his car and drove to the parking lot. Elsa thereafter arrived in the Corsica and parked right next to him. Jairo and Perez, who had taken a different vehicle, were delayed.

When the two men finally arrived in a black Isuzu[3] driven by Jairo, Olivier approached the vehicle and explained that his partner had the cocaine and would be arriving shortly. Jairo made a comment indicating that he was not pleased with the arrangements, but about that time the partner, who was actually an FBI agent, pulled into the Sears lot.

While Olivier walked over to meet the agent, the black Isuzu took off without explanation.[4] After surveying the immediate area, the vehicle returned. Olivier again approached the Isuzu and received instructions from Jairo as to where to put the cocaine. Jairo also asked Olivier if he had gotten the money yet.[5]

Shortly thereafter, Olivier gave a prearranged signal and FBI surveillance agents moved in and arrested Jairo, Elsa, and Perez. The arresting agents also recovered the duffel bag from the maroon Corsica. It contained $85,000, the agreed price for the five kilos.

Shortly after his arrest, Perez stated that no one else was involved and also confessed that he was going to receive $500 per kilogram for arranging the drug transaction. Jairo made a postarrest statement in which he said that he was going to deliver the five kilograms of cocaine to a black male. Elsa, however, did not make a statement.

### B. District Court Proceedings

All three defendants were indicted for their activities and all three invoked their right to a jury trial. Olivier, by virtue of his role in the process, became the government's principal witness. In recounting the flurry of activity that accompanied the arrests, he included a description of his efforts to help non-Spanish-speaking agents communicate with the defendants. In particular, he told the jury that he translated an agent's request for Elsa's name.

The prosecutor followed with the question, "And what happened then?" Olivier responded, "I mentioned some words to the effect that 'We need her name' and that 'We will welcome her cooperation, if any, if she will....'" An objection by Elsa's counsel cut him off in midsentence. The assistant United States attorney, in response to an inquiry by the district court, stated that he did not intend to question further in that area. The district court made no formal ruling on the objection and Elsa's attorney did not request one.

Direct examination resumed and Olivier described the circumstances surrounding the postarrest statements by Jairo and Perez. Olivier told the jury that he approached each of these men and told them that he would welcome their cooperation. He then related the substance of their statements. Counsel for the defendants made no objection to this testimony other than a request that the court give a limiting instruction about statements that were not in furtherance of the conspiracy.

The next morning, Elsa's counsel moved for a mistrial on the ground that his client's constitutional rights had been violated by the aforementioned testimony. After hearing arguments, the district court denied the motion with the following observation:

> Okay. My sense of it is, ... although I think you should make the motion, that

---

**3.** The vehicle was registered to Jairo's wife.

**4.** While the Isuzu was driving around, Olivier told Elsa, "I don't want to be standing here." "Me neither," she responded.

**5.** Their brief conversation (which did not translate smoothly into English) went as follows:
Jairo Ramos: Let's go right now. You can put it the same trunk ... Did you already get the money or haven't you ...
Olivier: No, I ... you ... tell me. I think you and should go in this car.
Perez: Oh, yes.
Jairo Ramos: Put it in there in the same car.
Olivier: Huh?
Perez and Jairo Ramos: Put it in there.
Olivier: In this one?
Perez: Yeah.

it was brief and the objection was made. The objection was upheld right away. It's not going to be argued. It seems to me that, although there is a reference, "We'd appreciate your help," I just don't think it rises to a mistrial problem and so I will deny it.

The district court offered to give a curative instruction drafted by Elsa's attorney, but the offer was declined.

All three defendants were convicted. At sentencing, Jairo's counsel objected to only one portion of the presentence report—a two-point upward adjustment for being an organizer or supervisor of criminal activity. In response, the district court stated, "I think you would have an interesting argument, and perhaps even a winning argument, if it were not for what your client said after he was arrested." Based on the evidence before it, however, the district court concluded that "there is a fair inference ... that [Jairo] is the man with the power in the transaction." [6]

Jairo's counsel nevertheless continued to argue the point and Jairo, through an interpreter, made the following statement:

If I was the leader or the organizer, I never would have risked a sister of mine, because the decision came from the person who was talking with Agent Olivier for her to show the money and to take it.

He asked for me to go along, too. But I never was the leader of this situation. . . .

Jairo also told the district court that he was a working man who could not raise $85,000 for a drug deal.

The district court, on hearing Jairo's statement, announced that it was beginning to "rethink [its] position a little," and expressed an interest in hearing more from Jairo, if he chose. The district court was especially interested in learning from where the $85,000 was obtained. Jairo

agreed, and his counsel questioned him about his role in the transaction.

Jairo's testimony, as the district court later observed, did not comport with the evidence at trial. Jairo said that he did not become aware of the $85,000 until he was arrested. He further testified that he thought "something was strange" when they pulled into the Sears parking lot; "something bad" might have been going on, "but not drugs." Despite reassurances from Perez, he drove out of the parking lot and only came back after Perez told him that they were "just going to deliver some money." He also came back because his sister was there, and "something bad could happen to her." He admitted that, on the advice of Perez, he had said something about a black man, but denied saying that he was going to sell cocaine to the man.

After hearing this testimony as well as further argument from the parties, the district court remained loyal to its initial conclusion. It found that Jairo was an "organizer, leader, manager, or supervisor" of the criminal activity and increased his offense level by two points to thirty-four. The district court then announced, "I will sentence Mr. Ramos to the lowest amount possible under the guidelines, which is 151 months, which I think is more than adequate to deal with the problem we have here." [7]

Elsa appeals only the district court's ruling on her motion for a mistrial. Jairo appeals only the district court's decision to add a two-point increase to his total offense level. For the following reasons, we affirm both rulings.

## II.

### A. *Elsa Ramos*

 Under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976),

---

**6.** The district court expressly stated that in making its decision it was not relying upon the fact that Jairo may have financed the purchase.

**7.** The sentencing range for a total offense level of 32 is 121 months to 151 months. Thus, had the district court instead concluded that a total offense level of 32 was appropriate, it could

have still sentenced Jairo to 151 months. The government could have raised an argument based on this overlap, *see United States v. Bermingham*, 855 F.2d 925, 930–31 (2d Cir.1988), *cited with approval in United States v. Tetzlaff*, 896 F.2d 1071, 1073 (7th Cir.1990), but did not, and has therefore waived the right.

and its progeny, it is a violation of the due process clause of the fourteenth amendment for a prosecutor to use as evidence, even for impeachment, a defendant's refusal to talk after the government administers *Miranda* warnings. *Thomas v. Indiana*, 910 F.2d 1413, 1414 (7th Cir.1990). This court has also held that it is a violation of the fifth amendment privilege against self-incrimination to allow a prosecutor to use as evidence of guilt a defendant's refusal to talk to the police. *United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1017–18 (7th Cir.1987). Elsa appears to rely on both constitutional provisions, but for our purposes the analysis is the same; the lack of a sufficient reference to Elsa's silence is fatal to either argument, and our review of the record does not reveal such a reference.

■ Although a mere formality in many cases, a defendant, as a predicate to relief, must be able to establish a reference to his or her silence. In determining whether such a reference exists, we follow the same standard that we use in analyzing alleged comment on a defendant's failure to testify at trial. *United States ex rel. Smith v. Rowe*, 618 F.2d 1204, 1210 (7th Cir.) (per curiam), *judgment vacated and remanded on other grounds sub nom. Franzen v. Smith*, 449 U.S. 810, 101 S.Ct. 57, 66 L.Ed.2d 13 (1980); *see also United States v. Ashford*, 924 F.2d 1416, 1425 (7th Cir. 1991). Under this standard, we must determine whether: (1) "it was the prosecutor's manifest intention to refer to the defendant's silence"; or (2) "the remark was of such a character that the jury would 'naturally and necessarily' take it to be a comment on the defendant's silence." *Id.* (quoting *United States v. Edwards*, 576 F.2d 1152, 1154 (5th Cir.1978)); *accord United States v. Rosenthal*, 793 F.2d 1214,

1241–43 (11th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987).[8] Comments meeting either of these tests may render a conviction constitutionally suspect.

■ Under Elsa's logic, it is sufficient that Olivier was about to comment directly on her silence when he was interrupted by an objection. If that alleged reference is not sufficient, however, then she offers an alternative argument. Even though Olivier was silenced before he could make any direct comment, he nevertheless told the jury that he asked all three defendants to cooperate. He also detailed postarrest statements by Jairo and Perez but at no point did he discuss any cooperation efforts or postarrest statements by Elsa. Therefore, the argument goes, the jury knew by inference that she remained silent, and that knowledge impermissibly tainted her trial.

Elsa has not suggested, nor would the record support, a determination that it was the prosecutor's manifest intention to refer to her silence. There is no evidence that the prosecutor actively sought to elicit Olivier's response; the initial question ("And what happened then?") was not facially objectionable,[9] and after Elsa objected to Olivier's volunteered statements the prosecutor immediately proceeded to a new topic and made no use of Elsa's postarrest behavior during the remainder of the trial. Admittedly, the new topic was the postarrest statements by Perez and Jairo. Olivier, however, was merely continuing to recount events in the order that they had occurred, and on this record we cannot infer an impermissible intent from the introduction of evidence in a chronological fashion.

---

**8.** In *Rosenthal,* a federal agent told the jury about an interview with married codefendants. When the agent asked a question, the husband before answering would stare at his wife, who remained silent. Her counsel objected on the ground that the agent's testimony was an impermissible reference to the wife's silence. The court disagreed, however. It noted that the testimony was relevant to show the husband's state of mind and behavior during the course of the interview. When viewed in context, the

testimony did not display a manifest intent to comment on the wife's silence. Nor would the jury "naturally and necessarily" construe the evidence as a comment on the wife's silence. 793 F.2d at 1243.

**9.** *Compare Greer v. Miller,* 483 U.S. 756, 759, 107 S.Ct. 3102, 3105, 97 L.Ed.2d 618 (1987) (prosecutor asked, "Why didn't you tell this story to anybody when you got arrested?").

■ Nor can we conclude that the jury would have "naturally and necessarily" interpreted the testimony in the suggested manner. The record contains no direct references to Elsa's silence and a timely objection prevented Olivier from making any direct observations about Elsa's postarrest behavior.[10] As to the alternative argument offered by Elsa, an emphasis on the statements of one codefendant generally does not constitute impermissible comment on the silence of another codefendant. *See Rosenthal,* 793 F.2d at 1243; *cf. United States v. Mayes,* 917 F.2d 457, 461 (10th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1087, 112 L.Ed.2d 1192 (1991); *United States v. Jones,* 839 F.2d 1041, 1055 (5th Cir.), *cert. denied,* 486 U.S. 1024, 108 S.Ct. 1999, 100 L.Ed.2d 230 (1988); *United States v. McClure,* 734 F.2d 484, 491 (10th Cir.1984); *United States v. Vera,* 701 F.2d 1349, 1363 (11th Cir.1983) ("The mere favorable observation of the willingness of one of several co-defendants to testify does not constitute an impermissible comment on the failure of the other co-defendants to testify.") (citing *United States v. Diecidue,* 603 F.2d 535, 553 (5th Cir.1979)). Here, the postarrest statements by Perez and Jairo were highly relevant to their convictions and were offered primarily for that purpose. The secondary meaning suggested by Elsa is deemed too tenuous for the jury to appreciate.

Our conclusion is bolstered by a number of factors. First, Elsa's counsel failed to raise the alternative theory until the day after the testimony had been elicited. *See Rowe,* 618 F.2d at 1210–11 (defense counsel's failure to object at time of allegedly improper testimony is factor to be weighed). Second, Elsa's counsel declined the district court's invitation to draft a specific curative instruction, and the jury was otherwise instructed that their verdict should be influenced neither by counsels' objections nor by a defendant's willingness to invoke an absolute right not to testify.

In sum, we find no basis for concluding that Elsa's constitutional rights were violated by the challenged testimony. Not only was there no direct reference to her postarrest silence, but the alleged indirect references do not rise to the level of constitutional error.[11] And with that conclusion, we move on to Jairo's challenge to his sentence.

## B. Jairo Ramos

■ When a defendant challenges a sentence issued under the Sentencing Reform Act of 1984, 18 U.S.C. §§ 3551–3742; 28 U.S.C. §§ 991–998, and the accompanying Sentencing Guidelines ("Guidelines"), both the range and manner of appellate review are limited by statute. *See* 18 U.S.C. §§ 3742(e), (f); *see also United States v. Guerrero,* 894 F.2d 261, 264–65 (7th Cir. 1990). We must give due regard to the district court's credibility determinations and must credit its findings of fact unless clearly erroneous. We must also give due deference to the district court's application of the Guidelines to the facts. 18 U.S.C. § 3742(e); *see also United States v. Marshall,* 908 F.2d 1312, 1326 (7th Cir.) (en banc) ("Once the judge passes on contested issues of fact, or application of law to fact, our review is deferential."), *cert. granted*

---

**10.** Even if the jury would naturally and necessarily interpret Olivier's interrupted testimony as a reference to Elsa's refusal to talk, our case law teaches that the reference violates neither the fifth nor the fourteenth amendment because the prosecutor was not permitted to *use* that testimony. *See Lindgren v. Lane,* 925 F.2d 198, 200–03 (7th Cir.1991) ("mere transcript witness' reference to defendant's silence," without evidence that the prosecutor used or was permitted to use that testimony, does not constitute a violation of the fourteenth amendment) (*"Doyle* does not impose a prima facie bar against any mention whatsoever of a defendant's ... [postarrest silence], but instead guards against the exploitation of that constitutional right by the prosecutor."); *Savory,* 832 F.2d at 1017 (within context of fifth amendment, requiring prosecutor's "use" of reference to defendant's silence); *United States v. Kimberlin,* 805 F.2d 210, 238 (7th Cir.1986), *cert. denied,* 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987); *see also Greer,* 483 U.S. at 764–65, 107 S.Ct. at 3108–09; *Franklin v. Lynaugh,* 823 F.2d 98, 99 (5th Cir.), *cert. granted in part on other grounds,* 484 U.S. 891, 108 S.Ct. 221, 98 L.Ed.2d 180 (1987), *aff'd,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).

**11.** In light of our conclusion, we do not discuss the issue of harmless error.

*on other grounds sub nom. Chapman v. United States,* — U.S. —, 111 S.Ct. 579, 112 L.Ed.2d 584 (1990).

■ Under section 3B1.1 of the Guidelines, a sentencing court may increase a defendant's offense level by two points if the preponderance of the evidence establishes that the defendant "was an organizer, leader, manager, or supervisor in any criminal activity." [12] The Guidelines do not define these terms [13] but they do suggest factors that are relevant in making that determination. These include: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others.[14] *See* Guidelines § 3B1.1 comment. (n.3); [15] *see also United States v. Paden,* 908 F.2d 1229, 1234 (5th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 710, 112 L.Ed.2d 699 (1991). Due to its heavy rooting in factual findings, the district court's ultimate determination is itself reviewed as a finding of fact. *See United States v. Brown,* 900 F.2d 1098, 1101 (7th Cir.1990).

■ Here, while the transaction was being negotiated, Jairo Ramos provided shelter for the other two participants.[16] He also provided vehicles, a telephone, and various other instrumentalities (like the duffel bag) used to carry out the illegal transaction. When the time came to conduct the exchange, Jairo allowed Elsa to remain at risk in the parking lot while he engaged in countersurveillance.[17] He then returned to Olivier's car and began to exhibit control by instructing Olivier to transfer the cocaine and pick up the money.[18] After his arrest, Jairo told Olivier that he was responsible for delivering the cocaine to another party.[19] Last, when offered the

---

**12.** The adjustment is supported primarily by concerns of relative responsibility. Guidelines § 3B1.1 comment. (backg'd). It is also supported, however, by the belief that "persons who exercise a supervisory or managerial role in the commission of the offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate." *Id.*

**13.** Status as an organizer or leader may be more culpable than status as a manager or supervisor, *compare* Guidelines § 3B1.1(a) *with id.* § 3B1.1(b), but this particular distinction is not important to our discussion. *See id.* § 3B1.1(c); *see also United States v. Herrera,* 878 F.2d 997, 1000 n. 1 (7th Cir.1989); Guidelines § 3B1.1 comment. (backg'd).

**14.** The location of these factors in the Guidelines commentary in some ways suggests that the primary purpose of this list is to assist in distinguishing organizers and leaders from managers and supervisors. The factors appear to be just as relevant and useful, however, in distinguishing between those defendants who should be classified within section 3B1.1(c) and those who should not.

**15.** The commentary to the Guidelines (which includes the application notes) is to be treated as "the legal equivalent of a policy statement." Guidelines § 1B1.7; *see Guerrero,* 894 F.2d at 265 n. 2.

**16.** *See United States v. Vasquez,* 874 F.2d 250, 252 (5th Cir.1989).

**17.** *See United States v. Spillman,* 924 F.2d 721, 723–24 (7th Cir.1991) (one factor in section 3B1.1 analysis is recruitment and direction of other members of conspiracy); *United States v. Busche,* 915 F.2d 1150, 1151–52 (7th Cir.1990) (one factor in section 3B1.1 analysis is recruitment of girlfriend into criminal activity); *Herrera,* 878 F.2d at 1002 (defendant's control over his wife was sufficient to merit finding that defendant was "organizer" under section 3B1.-1(c)).

**18.** Jairo argues, however, that these statements were wrongly attributed to him. Olivier, he notes, identified the defendants' voices on the basis of which side of the Isuzu he approached, and the attribution of the statements to Jairo was at least in part because Olivier remembered approaching the driver side of the Isuzu. Another government witness, however, observed Olivier approaching the passenger side of the Isuzu. And this discrepancy, Jairo argues, casts significant doubt on Olivier's testimony about who made the aforementioned statements.

Olivier, however, also testified that he could identify the voices in the taped conversation on the basis of the distinctive accents. Perez, he noted, had a "Puerto Rican New York" accent and Jairo had a "South American accent from Columbia, Ecuador." Thus, the attribution is not clearly erroneous.

**19.** *United States v. Carrillo,* 888 F.2d 117, 118 (11th Cir.1989) (one factor in section 3B1.1(c) analysis is defendant's responsibility for receiv-

opportunity to make a statement during sentencing, Jairo's testimony did not comport with the evidence at trial.

Jairo's primary argument is that he could not have been an organizer or supervisor because Perez organized and supervised the transaction. It was Perez, he notes, who initiated communication with Olivier. Perez then flew to Chicago and conducted the negotiations necessary to set up the narcotics purchase. Perez also did most of the talking on the date of the transaction. Perez, not Jairo, thus deserved the section 3B1.1(c) addition.

While we do not deny that Perez played a significant role in the transaction, a finding that Perez's conduct brought him under section 3B1.1(c) would not be of such great assistance to Jairo. The commentary to the Guidelines clearly states that more than one person can qualify as an organizer of a criminal offense. Guidelines § 3B1.1 comment. (n.3); *see Paden,* 908 F.2d at 1234. It is not necessary, moreover, that Jairo control all aspects of the scheme to be an organizer or a supervisor. *Brown,* 900 F.2d at 1102.[20] Of course, in view of the apparently limited number of participants in this particular criminal activity, Perez's role might make it less likely that Jairo was an organizer or supervisor. It appears from our review, however, that the district court took Perez's role into account in making its determination.[21]

A fact-finder's choice between two permissible views of the evidence cannot be clearly erroneous. *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *see also*

*Brown,* 900 F.2d at 1102. In order to prevail, Jairo must do more than establish that another conclusion was possible; he must leave this court " 'with the definite and firm conviction that a mistake has been committed.' " *See United States v. White,* 903 F.2d 457, 460 (7th Cir.1990) (quoting *Herrera,* 878 F.2d at 1000). In our view, however, he has not met this burden; there is sufficient evidence here to support the district court's careful determination that Jairo was exercising a leadership role.

### III.

For the aforementioned reasons, Elsa Ramos's conviction and Jairo Ramos's sentence are

AFFIRMED.

---

ing shipments of cocaine and distributing allotments to others).

**20.** Jairo also quibbles with the district court's belief at the sentencing hearing that he was going to sell (as opposed to deliver) the cocaine to a black man, and suggests that someone who buys cocaine and only delivers (rather than sells) it to a subsequent distributor cannot be an organizer. Not only did his counsel fail to make a timely objection, however, but the district court's misunderstanding was insignificant. At no point has Jairo suggested that he would not profit from his subsequent activity, whether delivery or sale, and he can still fall within section 3B1.1 even if his role was only that of a middleman. "Indeed, a 'middleman who sim-

ply coordinates the purchase of drugs from sources and sells to others may be an organizer even if his operation can be characterized as minimally structured.' " *Brown,* 900 F.2d at 1102 (quoting *United States v. Barreto,* 871 F.2d 511, 512 (5th Cir.1989) (citation omitted)); *see also Carrillo,* 888 F.2d at 118 ("That there were bigger fish in the larger scheme does not, however, absolve [the defendant] of the supervisory role he played....").

**21.** Jairo also maintains that Armando (the government informant from Miami) was actually the leader. This argument, however, is no more effective than the argument concerning Perez, and we reject it for the same reasons.