**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Demetrio J. HERNANDEZ and Wayne Parrish, Defendants–Appellants.**

**Nos. 90–2987, 90–3094.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 11, 1991.

Decided Nov. 15, 1991.

Rehearing and Rehearing En Banc
Denied Jan. 15, 1992.

Barry R. Elden, Diane L. Saltoun (argued), Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, Ill., for U.S.

Richard F. Walsh (argued), Chicago, Ill., for Demetrio J. Hernandez.

Anthony Pinelli (argued), Chicago, Ill., Michael T. Norris, Schaumburg, Ill., for Wayne Parrish.

Before WOOD, Jr., FLAUM, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Demetrio Hernandez and Wayne Parrish were charged with and convicted of conspiracy to possess and distribute one kilogram of cocaine, in violation of 21 U.S.C. § 846. Mr. Hernandez asks that the indictment against him be dismissed on the ground that the government's conduct during plea bargaining deprived him of effective assistance of counsel. Mr. Parrish challenges his conviction for insufficiency of the evidence, and on the ground that his rights against self-incrimination and to due process, both protected by the Fifth Amendment, were violated. For the following reasons, we affirm.

I

BACKGROUND

An informant introduced Demetrio Hernandez to undercover agent Art Martinez. Mr. Hernandez arranged to purchase a kilogram of cocaine from Agent Martinez for $20,000, a price which reflected Mr. Hernandez's stated intention of continuing to buy two to three kilograms a week from Agent Martinez. The sale was to take place at Denny's restaurant near O'Hare airport, a location (as Mr. Hernandez told the undercover agent) conveniently close to the person who supplied Hernandez with money.

Agents watching outside Denny's on the day set for the sale saw Mr. Hernandez drive up, park, and enter the restaurant. Forty minutes later Mr. Hernandez left Denny's and drove to the Citgo gas station adjoining Denny's parking lot. When Wayne Parrish drove up, Mr. Hernandez got into Mr. Parrish's car. The two then drove around the Citgo parking lot for about five minutes, stopping for a moment near some phone booths. Then, their tour of the Citgo lot complete, Mr. Hernandez,

carrying a white object, left Mr. Parrish's car and got back into his own car.

Mr. Parrish drove his car back to the phone booths and parked facing Denny's parking lot. He sat in his car with a phone to his ear for approximately twenty minutes. At trial, agents testified that he appeared to be watching the events which then took place in Denny's parking lot. Mr. Parrish, who testified at the trial, claimed that he was on the phone for only two minutes, but the police videotape, which recorded the time each image was shot, offers some, albeit imperfect,[1] corroboration of the officers' testimony that he was there for twenty minutes.

Meanwhile, Mr. Hernandez had returned to Denny's and parked. When the undercover agent arrived, Mr. Hernandez suggested that they carry out the transaction across the street because there were policemen inside Denny's. The agent asked to see Mr. Hernandez's money first, and Mr. Hernandez walked over to the agent's car and handed him a white bag with $18,040 inside. Then Mr. Hernandez and Mr. Parrish, who was still sitting in his car at the Citgo station, were arrested.

In Mr. Parrish's car, the police found a manual for a pager and an application for pager insurance. The front and back license plates on Mr. Parrish's car had different numbers. Neither number was registered to Mr. Parrish. Mr. Parrish had no driver's license, car title, or car registration with him or in the car. Mr. Parrish's bank passbook was found in the passenger compartment of Mr. Hernandez's car.

## II

## ANALYSIS

### A. *Mr. Hernandez*

██ Mr. Hernandez asserts that his Sixth Amendment right to effective assistance of counsel was violated because his confidence in his attorney was compro-

mised by government conduct during plea bargaining.

1. Facts surrounding the plea bargaining

During initial plea bargaining, the government sought Mr. Hernandez's testimony against Mr. Parrish and offered to recommend a sentencing departure in return for cooperation. Mr. Hernandez's attorney told the government that Mr. Hernandez would not cooperate because he feared for his family.

Mr. Hernandez's attorney and the government then negotiated a plea agreement under which the government agreed that sentencing for the conspiracy would be based on only one kilo of cocaine. In the agreement, the government gave no assurances that it would not immunize Mr. Hernandez in order to obtain his testimony against Mr. Parrish. However, his attorney advised him that, if he pled guilty pursuant to the agreement, he would not have to testify.

Mr. Hernandez signed the agreement and pled guilty. The government then announced that it would seek to immunize Mr. Hernandez and compel him to testify against Mr. Parrish. Mr. Hernandez was permitted to withdraw his guilty plea, but the court refused to dismiss the indictment. Mr. Hernandez went immediately to trial, was found guilty and, with the government's acquiescence, was sentenced for one kilogram of cocaine (the sentence level promised in the plea agreement). Mr. Hernandez was tried together with Mr. Parrish and did not testify against him.

2. Mr. Hernandez's contentions

Mr. Hernandez submits that "the conduct of the government in attempting to immunize him when they knew he had entered a plea of guilty based upon noncooperation interfered with the defendant's right to effective assistance of counsel." Appellee's Br. at 8. Mr. Hernandez argues

---

**1.** The videotape did not record in its entirety Mr. Parrish's twenty-minute wait at the phone booth. The tape recorded his presence at 11:37 and again at 11:57. According to the officer's testimony, there was difficulty in maneuvering the equipment. However, the times shown on the videotape were confirmed by the testimony of the agents.

that he was not advised effectively by his attorney when the attorney incorrectly reported to him the terms of the plea agreement. He further submits that permission to withdraw the plea did not correct the situation because his "confidence in his counsel had to have been compromised." This lack of confidence, he argues, meant that counsel's assistance was also ineffective during trial. Mr. Hernandez contends that the only remedy for the alleged constitutional violation is dismissal of the indictment.

Mr. Hernandez relies on *Cooper v. United States*, 594 F.2d 12 (4th Cir.1979). In *Cooper*, the government withdrew its offer of a plea agreement after defense counsel had communicated it to the defendant and the defendant had instructed his attorney to accept it. The Fourth Circuit determined that the government's failure to honor its plea proposal violated the defendant's right to due process and to effective assistance of counsel. *Cooper*, 594 F.2d at 18–19. The court stated:

> Because prosecutors are required to conduct plea negotiations through defense counsel, the government's position and communications in plea discussions are necessarily mediated to the defendant through his counsel. For this reason, not only the credit and integrity of the government but those of his counsel are involved in a defendant's perception of the process.... To the extent that the government attempts through defendant's counsel to change or retract positions earlier communicated, a defendant's confidence in his counsel's capability and professional responsibility, as well as in the government's reliability, are necessarily jeopardized and the effectiveness of counsel's assistance easily compromised. At the very least, these Sixth Amendment considerations add a heightened degree of obligation to the government's fundamental duty to negotiate with scrupulous fairness in seeking guilty pleas.

*Id.* Although in *Cooper* there was "no suggestion ... of deliberate abuse of the

assumed opportunity freely to make and withdraw plea proposals as a means of testing the wills and confidence of defendants and their counsel or of deliberate harassment," the court ordered the remedy of specific enforcement of the plea proposal, to the extent then possible. *Id.* at 20.

### 3. Analysis

At the outset, it is important to focus upon the precise nature of Mr. Hernandez's claim. He does not claim that the government broke a promise or deliberately misled his attorney during the plea bargaining. He simply claims that the prosecution knew that his attorney had bargained on the basis that the government would not seek to immunize Mr. Hernandez. It is also important to note that Mr. Hernandez certainly can claim no prejudice from his initial guilty plea. Although the government had not reneged on any promise—a situation for which the possible remedies would have included specific enforcement of the government's promise or permission to withdraw the guilty plea [2]—the district court prudently permitted him to withdraw his guilty plea. Nevertheless, he achieved the two objectives that he sought in the plea negotiations: he was sentenced in the same range applicable under the plea agreement, and he did not testify against his co-defendant, Mr. Parrish. However, Mr. Hernandez asserts that, in this case, additional relief is necessary. Specifically, he asserts that it is necessary to remedy an undermining of his faith in his counsel and the consequent deprivation of effective assistance of counsel by dismissal of the indictment against him.

The basic principles that must guide our decision are well-established. "Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." *United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1983). "In certain Sixth Amendment contexts, prejudice is presumed." *Strickland v. Washington*, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80

**2.** *See Santobello v. New York,* 404 U.S. 257, 263, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971).

L.Ed.2d 674 (1984). These are circumstances "that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic,* 466 U.S. at 658, 104 S.Ct. at 2046 (footnote omitted). "Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance." *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067. Prejudice has been presumed from direct state interference with counsel's decision making process.[3]

It is clear that the government's alleged conduct does not constitute direct interference with counsel's assistance and therefore does not raise the presumption of prejudice to which the Supreme Court referred in *Cronic.* Nor were circumstances such that "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Cronic,* 466 U.S. at 660, 104 S.Ct. at 2047. Moreover, Mr. Hernandez's reliance on the decision of the Fourth Circuit in *Cooper* is to no avail. In *Mabry v. Johnson,* 467 U.S. 504, 507–10, 104 S.Ct. 2543, 2546–48, 81 L.Ed.2d 437 (1983), decided under the Due Process Clause, the Supreme Court overruled *Cooper* to the extent that *Cooper* held the plea agreement enforceable even *before* the defendant relied on it by pleading guilty. *See also Plaster v. United States,* 789 F.2d 289, 292–93 (4th Cir.1986) (recognizing the impact of *Mabry* on *Cooper* ). The Court also left little doubt that it disapproved of *Cooper's* Sixth Amendment analysis:

> Respondent suggests that the prosecutor's withdrawal of the initial offer undermined his confidence in defense counsel, in violation of his Sixth Amendment right to counsel. This argument is simply at odds with reason.... We fail to

see how an accused could reasonably attribute the prosecutor's change of heart to his counsel any more than he could have blamed counsel had the trial judge chosen to reject the agreed-upon recommendation, or, for that matter, had he gone to trial and been convicted.

*Mabry v. Johnson,* 467 U.S. at 510 n. 10, 104 S.Ct. at 2548 n. 10 (1983); *see also Government of Virgin Islands v. Scotland,* 614 F.2d 360, 363 (3d Cir.1980) (loss of faith in attorney because of unsuccessful plea bargaining is not enough to violate the defendant's Sixth Amendment right absent detrimental reliance). Consequently, Mr. Hernandez is not entitled to relief unless he can demonstrate prejudice—a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Mr. Hernandez points to no facts to show that he was prejudiced during the course of the trial or even during the plea bargaining itself. Although Mr. Hernandez claims that his confidence in his counsel was compromised, he has the same counsel representing him in this appeal. *See Cooper v. United States,* 594 F.2d at 19 n. 9 (replacement of defense counsel a strong indication of a loss of confidence). Consequently, he is entitled to no relief—and certainly not to the relief he seeks, dismissal of the indictment. *See United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) ("absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate").

## B. *Mr. Parrish*

Mr. Parrish attacks his conviction on three grounds: (1) there was insufficient evidence; (2) the jury heard testimony that he remained silent after arrest; and (3) the prosecution violated Mr. Parrish's due pro-

---

**3.** *See, e.g., Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (bar on consultation between attorney and client during overnight recess); *Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (bar on

defense summation at bench trial); *Ferguson v. Georgia,* 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961) (bar on direct examination of the defendant).

cess rights by interfering in Mr. Hernandez's attempted guilty plea.

### 1. Insufficiency of the evidence

Mr. Parrish contends that the government failed to present sufficient evidence to sustain his conviction for conspiracy to distribute cocaine. In raising this challenge Mr. Parrish bears a "heavy burden." *See United States v. Scroggins*, 939 F.2d 416, 421 (7th Cir.1991). "The test is whether, after viewing the evidence in the light most favorable to the government, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir. 1984) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)); *accord United States v. Scroggins*, 939 F.2d 416, 421 (7th Cir.1991). In conspiracy cases, we determine if there is substantial evidence to support the existence of a conspiracy and the defendant's participation in that conspiracy. *See United States v. Brown*, 934 F.2d 886, 889 (7th Cir.1991); *United States v. Allen*, 930 F.2d 1270, 1274 (7th Cir.1991); *United States v. Durrive*, 902 F.2d 1221, 1228–29 (7th Cir.1990). "A conspiracy by its very nature involves clandestine plans to commit a crime; the heart of a conspiracy is an agreement. Consequently, circumstantial evidence may be used to prove the conspiracy's existence." *United States v. Brown*, 934 F.2d 886, 889 (7th Cir.1991).

Mr. Parrish argues that the only evidence presented of his participation in the conspiracy was his presence in the vicinity of the transaction. While it is true that presence by itself is not enough to prove participation in a conspiracy, *United States v. Atterson*, 926 F.2d 649, 656 (7th Cir.1991), here there is more. Mr. Parrish was present at the scene and remained after the ostensible purpose for his presence (to show Mr. Hernandez a car) had been accomplished. Agents watching the transaction testified that, when Mr. Hernandez left Mr. Parrish's car after driving around the Citgo lot, Mr. Hernandez was carrying a white object. Soon afterwards, Mr. Hernandez gave the undercover agent $18,040 in a white plastic bag. Both bag and money were introduced into evidence. Although agents were unable to see whether Mr. Hernandez had anything in his hand when he got into Mr. Parrish's car, a rational jury could have concluded that Mr. Parrish gave Mr. Hernandez the white object and that the white object was the white plastic bag with the money in it. Such a belief would be corroborated by the taped conversations between Mr. Hernandez and the undercover agent in which Mr. Hernandez mentioned meeting his money supplier near O'Hare airport and by testimony that Mr. Parrish positioned his car to watch the transaction between Mr. Hernandez and the undercover agent. Moreover, Mr. Parrish's testimony at trial was contradicted directly on several points by the agents who witnessed the events in question. Mr. Parrish testified that he met Mr. Hernandez at the Citgo parking lot to sell him a car and to take the car for a "test drive." During the test drive, according to Mr. Parrish, he and Mr. Hernandez left the Citgo lot and drove for two or three miles down the street; agents testified that the car did not leave the parking lot. Mr. Parrish testified that after Mr. Hernandez left him, he remained in the Citgo lot on the telephone for about two minutes; agents testified that he was there for more than twenty minutes, watching the transaction taking place outside Denny's. The non-matching license plates on the car, the beeper manual found in the car, and Mr. Parrish's bankbook found in Mr. Hernandez's car add to the weight of the evidence. *See United States v. Durrive*, 902 F.2d 1221, 1229 (7th Cir.1990) (evidence must be viewed as a whole, not piecemeal). In sum, we conclude that, viewed as a whole and in the light most favorable to the government, the evidence was sufficient to permit a rational jury to find beyond a reasonable doubt that Mr. Parrish participated in a conspiracy to possess and distribute cocaine.

### 2. Evidence of silence upon arrest
#### a. *the testimony at trial*

Mr. Parrish also challenges his conviction on the ground that there was constitutional

error in the admission of testimony that he remained silent when told he was under arrest.

Mr. Parrish was sitting in his car, when a DEA agent approached him, asked him to "exit the car," and told him he was under arrest. Tr. at 121. Mr. Parrish got out of the car without saying anything and was then read his *Miranda* rights. After he was given *Miranda* warnings, he did make some statements. It was not until the morning of trial that the prosecution informed Mr. Parrish's attorney of the statements that Mr. Parrish had made after he had been given *Miranda* warnings. The prosecution intended to introduce these statements as evidence.

At the trial, the prosecutor began asking questions about the arrest. At the first question ("When you approached Mr. Parrish and told him he was under arrest, did he say anything to you at that point?"), Mr. Parrish's defense attorney objected. He asked the court for a sidebar conference.

In the sidebar conference, Mr. Parrish's attorney told the court that he had learned of the statements only that morning and that he believed he could have had them suppressed. During the discussion, one of the prosecutors pointed out that there were really two issues: (1) Mr. Parrish's initial silence in response to being placed under arrest, and (2) the post-*Miranda* statements:

> MR. KING: There is one additional point, your Honor, and that is when the officer came up and said, "You are under arrest for a federal narcotics charge", something to that effect, he didn't respond to anything, and then he was ordered out of the car and then was read his *Miranda* rights and then there were certain questions answered. I think there's really two questions. One is that there was a statement by the officer with no response by the defendant and then there's specific *Miranda* rights and specific questions. Tr. at 123.

Neither the defense attorney nor the judge pursued the issue of Mr. Parrish's pre-*Miranda* silence at this point. The defense attorney, who was still concentrating on the post-*Miranda* statements, addressed the issue of whether Mr. Parrish had voluntarily waived his *Miranda* rights. Tr. at 124.

The judge then sustained the objection (apparently limited to the post-*Miranda* statements), and twice told the prosecutor to "go into another area." The prosecutor apparently still wanted to ask about Mr. Parrish's post-arrest, pre-*Miranda* silence. He asked the judge, "Another area, or simply the initial question? There was one question." The judge directed the prosecutor to read the question back in front of the jury. ("Read the last question back. Ask the question.") The prosecutor, following the court's direction, then read: "The question was at the time Mr. Parrish was placed under arrest, did he make any immediate response?" The witness answered "No", and Mr. Parrish's attorney objected and moved for mistrial. ("Judge, again, I have an objection and a motion for a mistrial.") Tr. at 125. The judge did not respond to the objection; he merely denied the motion for a mistrial and directed the prosecutor to go on to the next question. Thus, the silence was admitted.

The prosecutor then asked "What happened after that?", and the witness described telling Mr. Parrish that he was under arrest for a narcotics violation and asking Mr. Parrish if he could speak English, and Mr. Parrish answering yes. The defense attorney objected again and moved for mistrial. The court sustained the objection, telling the prosecutor (again) that he was not going to let him "elicit any of those statements." The prosecutor responded, "Okay, that is what I was not clear on."

### b. *discussion*

 "This court has . . . held that it is a violation of the Fifth Amendment privilege against self-incrimination to allow a prosecutor to use as evidence of guilt a defendant's refusal to talk to the police." *United States v. Ramos*, 932 F.2d 611, 616 (7th Cir.1991). *See United States v. Davenport*, 929 F.2d 1169, 1174 (7th Cir.1991); *United States ex rel. Savory v. Lane*, 832

F.2d 1011, 1017–18 (7th Cir.1987); *United States v. Caro*, 637 F.2d 869, 876 (2d Cir. 1981). *But see United States v. Harrold*, 796 F.2d 1275, 1279 (10th Cir.1986), *cert. denied*, 479 U.S. 1037, 107 S.Ct. 892, 93 L.Ed.2d 844 (1987). In *Savory*, the defendant, approached with questions in a non-custodial setting, refused to talk about the murders with which he was later charged. At trial, his refusal to talk to police during this initial questioning was introduced in the prosecution's case-in-chief. There are certain factual differences between Mr. Parrish's case and *Savory*. In *Savory*, the defendant affirmatively refused to answer questions. Here Mr. Parrish was only momentarily silent and later did make statements, the existence (not the contents) of which was disclosed to the jury. Unlike Savory, Mr. Parrish took the stand. Despite these differences, the present case falls under *Savory*. The fact that Mr. Parrish later took the stand does not allow the prosecutor to introduce impeaching evidence in its case-in-chief.[4]

Nor can we accept the government's suggestion that there was no implication of guilt in the evidence of Mr. Parrish's momentary silence because the information was given in response to a preliminary question and because the jury was made aware that Mr. Parrish did make some statements after being read his *Miranda* rights. The government likens the present case to *Lindgren v. Lane*, 925 F.2d 198 (7th Cir.1991) and *United States v. Ramos*, 932 F.2d 611 (7th Cir.1991). In *Lindgren*, the court examined the prosecutor's intentions and the circumstances in which the evidence was introduced to determine whether there was error. However, *Lindgren* involved not evidence of silence, but evidence, inadvertently elicited, that the defendant had asked for an attorney. The prosecutor did not follow up on the request for a lawyer or refer to it in closing argument. The court stated that the circumstances surrounding the testimony and the use made of it by the prosecutor should be considered in determining whether there had been error. The court determined that there was no evidentiary use made of the defendant's invocation of the right to counsel. The government now asks us to apply a similar reasoning to the evidence of Mr. Parrish's silence. However, unlike the prosecutor in the *Lindgren* case, the prosecutor here asked his question expecting the answer he got—that Mr. Parrish made no response.

The government also relies upon *Ramos* where the court required, as a prerequisite for constitutional error, either that it be "the prosecutor's manifest intention to refer to the defendant's silence" or that the "remark was of such a character that the jury would 'naturally and necessarily' take it to be a comment on the defendant's silence." *Ramos*, 932 F.2d at 616.[5] The government argues that the question here was merely preliminary and incidental to asking about the arrest, the *Miranda*

---

**4.** Our cases distinguish the situation here from the situation in which evidence of a defendant's silence *after Miranda* warnings is used to impeach the defendant's trial testimony. This latter use of silence is barred under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), with only very narrow exceptions. According to *Doyle*, the *Miranda* warning carries with it an implicit assurance that invocation of the right to remain silent will not be used against the person, even for impeachment. Thus, the giving of *Miranda* warnings is a prerequisite to a finding of constitutional error under *Doyle*. *See Greer v. Miller*, 483 U.S. 756, 766, 107 S.Ct. 3102, 3109, 97 L.Ed.2d 618 (1987). A defendant's silence *before Miranda* warnings is admissible to impeach the defendant. *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982).

**5.** In *Ramos*, a witness was stopped before he could refer to the defendant's silence. Later testimony concerning post-arrest cooperation and statements by codefendants might have allowed the jury to deduce that there had been no similar cooperation and statements by defendant, that is, that the defendant had been silent. However, there was no direct and intentional reference to the defendant's silence or anything that the jury would "naturally and necessarily" take to be a comment on the defendant's silence. Therefore there was no error. These facts are quite different from the present facts.

The government also submits that this issue is not properly before us because Mr. Parrish never made a proper objection to the testimony on the ground of the admission of silence. We do not believe that the record, read in its entirety, supports such a conclusion.

warnings, and the post-*Miranda* statements. Therefore, the government claims that

> the record establishes that it was not the government's 'manifest intention' to refer to the defendant's silence. The lack of any response by Parrish upon arrest was mentioned only as a result of a preliminary question. The government was seeking to elicit from the witness ... that he had given Parrish *Miranda* warnings and that Parrish waived these rights and made some statements.

Appellee's Br. at 25. We cannot accept this argument as an accurate characterization of the record. Here, the prosecutor returned to the question after the objection to the statements made after the *Miranda* warnings had been sustained. Therefore it is difficult to conclude that, when it was asked the second time, the question was preliminary to eliciting the already excluded statements. Here, the prosecutor deliberately elicited a direct reference to the defendant's silence upon initial confrontation with law enforcement officers.

### c. *harmless error*

" '[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' " *Arizona v. Fulminante,* —— U.S. ——, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991) (quoting *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)). To find an error harmless, the court must determine " 'whether there is a reasonable possibility that the [errors] complained of might have contributed to the conviction.' " *United States ex rel. Ross v. Fike,* 534 F.2d 731, 734 (7th Cir.1976) (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–31, 11 L.Ed.2d 171 (1963)). Judge Pell summarized succinctly the nature of our inquiry in *Mauricio v. Duckworth,* 840 F.2d 454, 459 (7th Cir.), *cert. denied,* 488 U.S. 869, 109 S.Ct. 177, 102 L.Ed.2d 146 (1988):

> In *United States ex rel. Savory v. Lane,* 832 F.2d 1011 (7th Cir.1987), we held that in assessing whether errors of constitutional magnitude, such as the one at issue here, are harmless beyond a reasonable doubt, "we must determine 'whether there is a reasonable possibility that the [errors] complained of might have contributed to the conviction.' " *Id.* at 1019 (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)). In essence, the inquiry comes down to the question, "whether absent the constitutionally-forbidden evidence, honest and fairminded jurors might very well have brought in not-guilty verdicts." *Burns v. Clusen,* 798 F.2d 931, 943 (7th Cir.1986) (citing *Chapman,* 386 U.S. at 25–26, 87 S.Ct. at 828–29). Typically, we require other evidence of guilt to be "overwhelming" before concluding a constitutional error was harmless. *Savory,* 832 F.2d at 1020; *United States v. Shue,* 766 F.2d 1122, 1132–33 (7th Cir.1985); *United States ex rel. Burke v. Greer,* 756 F.2d 1295, 1302 (7th Cir.1985).

Accord *Hunter v. Clark,* 934 F.2d 856, 860–61 (7th Cir.1991). Nevertheless, even when the evidence was not overwhelming, we have found the error harmless beyond a reasonable doubt when convinced that the impact of the objectionable material was negligible. *See Fencl v. Abrahamson,* 841 F.2d 760, 769 (7th Cir.1988); *Hanrahan v. Thieret,* 933 F.2d 1328, 1340 (7th Cir.1991) (considering the strength and believability of the defense in evaluating harmless error). In *Fencl,* we relied on the following factors to guide our determination: (1) the brevity of the prosecutor's references to the defendant's silence, (2) the minor role of the references in the government's case when viewed as part of the entire record, and (3) the fact that most of the references were made during the witness's narration of a sequence of events designed to show not that the defendant was silent, but that he voluntarily told the authorities inconsistent stories. *Fencl,* 841 F.2d at 769.

■ Under these standards, we conclude that the admission of testimony concerning Mr. Parrish's post-arrest silence was harmless beyond a reasonable doubt. Mr. Parrish's momentary silence could be evaluated as having independent evidentiary signifi-

cance only if the jury was asked to construe that silence as discrediting his story that he was at the site for a reason entirely unrelated to the drug transaction—the sale of a car. Perhaps it could have been argued that one might expect a somewhat more vocal reaction than silence when an innocent unsuspecting person is confronted by law enforcement officers and placed under arrest. There are, in our view, several problems with that argument in the context of this case. First, such an inference is not inexorable; many persons might be too shocked to speak. Secondly, the record affirmatively shows that the silence was momentary. The agent immediately inquired as to Mr. Parrish's ability to understand English. Perhaps most importantly, the jury was never asked to draw that inference. There was a single reference by the DEA agent to Mr. Parrish's initial silence. This single reference occurred in the midst of discussion about the admissibility of other matters. There was no reference to it on cross-examination of Mr. Parrish or in either opening statements or closing arguments. Viewed in the context of the entire record, the single reference to Mr. Parrish's silence was minor, and we are convinced its admission had no impact on the jury. Moreover, there were weaknesses in Mr. Parrish's defense: Mr. Parrish's testimony on the stand was directly contradicted at more than one point by the eyewitness testimony of the agents. In short, there is no reasonable possibility that the error contributed to the conviction.

3. Mr. Parrish's due process argument

Mr. Parrish's final challenge to his conviction is based on the government's plea bargaining with Mr. Hernandez. Mr. Parrish argues that, by interfering with Mr. Hernandez's guilty plea and trying Mr. Hernandez as his co-defendant, the government deprived him of exculpatory evidence. This contention is based on the fact that at sentencing Mr. Hernandez told his probation officer that Mr. Parrish did not give him the money.

Mr. Parrish makes no allegation that the government possessed exculpatory information that it did not disclose. He does not suggest that the government had any reason to believe that Mr. Hernandez would testify in his favor. In fact, all the facts suggest the opposite; the government believed that any testimony of Mr. Hernandez would have been adverse to Mr. Parrish.

If Mr. Parrish wished to obtain Mr. Hernandez's testimony, Rule 14 of the Federal Rules of Criminal Procedure permitted him to move for severance. *See, e.g., United States v. Bovain,* 708 F.2d 606, 610 (11th Cir.), *cert. denied,* 464 U.S. 898, 104 S.Ct. 251, 78 L.Ed.2d 238 (1983). The government is not required to plea bargain with defendants or defendants' attorneys. Fed.R.Crim.P. 11(e). If the government and the defendant reach a plea agreement, the court is not required to accept it. *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 498–99, 30 L.Ed.2d 427 (1971); Fed.R.Crim.P. 11(e)(3), (4). Thus a defendant has no right to complain that the government failed to negotiate or to accept a plea agreement from a co-defendant in order to remove that co-defendant from the umbrella of the Fifth Amendment and compel him to testify. Mr. Parrish's due process challenge is without merit.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED