Jeffrey E. **AKARD**, Appellant–
Defendant,

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 79A02–0904–CR–345.

Court of Appeals of Indiana.

March 30, 2010.

Timothy P. Broden, Lafayette, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Appellant–Defendant Jeffrey E. Akard appeals his convictions and sentences for three counts of Rape, two as Class A and one as a Class B felony, three counts of Criminal Deviate Conduct, two as Class A and one as a Class B felony, two counts of Criminal Confinement, as Class B felonies, and two counts of Battery, as Class C

felonies. We affirm the convictions, revise the sentences and remand with instructions.

### Issues

On appeal, Akard raises three issues, which we restate as:

I. Whether the trial court erred by admitting into evidence child pornography obtained from Akard's residence;

II. Whether it was fundamental error to permit testimony referencing Akard's post-arrest, pre-*Miranda* silence; and

III. Whether his aggregate sentence of ninety-three years is inappropriate.

### Facts and Procedural History

In the early hours of September 9, 2006, A.A. was in Lafayette, Indiana, and met Akard as he was walking down the street. Because he was purportedly drunk, Akard asked A.A. to walk him home so that he would not be charged with public intoxication, and A.A. obliged. After a fifteen minute walk, the two arrived at Akard's house at approximately 2:15 a.m., and A.A. went into the house so that she could use the bathroom. Once inside, Akard used a key to lock the deadbolt. The two then sat down on the couch and started a conversation, which included A.A. telling Akard that she was currently homeless and without any money. The topic eventually turned to Akard offering A.A. $150 for a "head job." Trial transcript at 67. A.A. agreed and proceeded to perform an act of oral sex on Akard. During the act, Akard grabbed A.A.'s head and forced her onto him to the point A.A. was choking and had "snot coming out of [her] nose." Tr. at 72. Akard continued to force A.A.'s head back and forth until he lifted her up and told her that "today was the day [she] was gonna die." *Id.*

A.A. repeatedly begged Akard to let her leave, but Akard ordered her to the bathroom and proceeded to cut A.A.'s t-shirt and bra in order to remove them. Akard then ordered A.A. to remove her pants and go into the bedroom. Despite A.A.'s repeated pleas to leave, Akard told her that she could not leave. Once in the bedroom, Akard said that he had "a toy" for A.A., reached under the bed, and then used a taser gun on A.A.'s back and heart area approximately five times. Tr. at 81. When A.A. began to scream, Akard reached under the bed for his handgun and held it to A.A.'s head.

A.A. then sat on the bed while Akard handcuffed her arms behind her back. Akard then forced A.A. to take some pills with Mountain Dew. During the process, A.A. spilled some of the Mountain Dew, causing Akard to become upset and hit A.A. in the head. Akard then ordered A.A. back to the bathroom where Akard undressed and they both entered the shower. While in the shower, Akard made A.A. kneel so that he could urinate in her mouth. A.A. spit out the urine, which upset Akard. Akard then hit A.A., knocking her unconscious.

When she awoke, she was laying face down on Akard's bed and now had zip ties restraining her ankles. As A.A. faded in and out of consciousness, Akard raped her vaginally and anally a total of four to five times. To prevent A.A. from screaming, Akard placed a golf ball in A.A.'s toothless mouth and then used a sock as a gag. While A.A. was bound, Akard used sex toys on both of them. At one point, A.A. woke up and noticed stockings on her legs that were not hers. During another instance of consciousness, A.A. realized that she had a metal, link chain tied around her and tied to the door, so that the chain would rattle every time she moved.

At another point when A.A. was only bound in handcuffs, Akard called out to A.A. from the living room, telling her to come to that room. Akard then showed A.A. "a lot" of pictures of child pornography on his laptop. Tr. at 99. During this display, Akard said that he had "done plenty" of children. Tr. at 100.

When A.A. finally woke the next day, she was in the bed and the chain was still around her. Pretending not to remember what happened, she commented to Akard, "we must have had some really kinky sex last night[.]" Tr. at 103. A.A. then indicated that she needed to leave immediately because she had to pick up her children. Akard responded, "Are we okay?" *Id.* A.A. indicated affirmatively. Akard then told A.A. that she had to take a shower before she left, which she did but purposely did not use soap.

Immediately after leaving Akard's apartment on the afternoon of September 9, 2006, A.A. ran to a neighboring house to obtain assistance. After A.A. told the neighbor that she was held against her will for nineteen hours and displayed her wounds, the neighbor called 9–1–1. After police responded and initially interviewed A.A., she was taken to the hospital where samples were collected for a rape kit analysis and pictures of A.A.'s wounds were taken.

The police obtained a search warrant for Akard's apartment based on A.A.'s statement and executed it early on the morning of September 10, 2006. When the officers breached the door, Akard was sitting on his couch, viewing pornography on his computer while masturbating. Items recovered from the apartment search included a set of keys on a key chain including a handcuff key, zip ties, a woman's Old Navy shirt that had been cut as well as a bra, a pair of handcuffs, a metal link chain, two golf balls and "fairly stretchable" socks, a stun gun, bottles of Tylenol, Tylenol PM, Doxycycline, Alprazolam and Hydrocodone, A.A.'s identification card and cell phone, a collection of sex toys, a BB gun, an air rifle, a handgun, purple and orange rope that was tied to the bed frame, blue stockings, and a laptop containing approximately 2900 pornographic pictures.

The State initially filed charges against Akard on September 14, 2006, but later filed a *nolle prosequi* motion to dismiss the case without prejudice. The motion was granted. On October 1, 2008, the State refiled charges against Akard of three counts of Rape, two as Class A felonies and one as a Class B felony, three counts of Criminal Deviate Conduct, two as Class A felonies and one as a Class B felony, two counts of Criminal Confinement, as Class B felonies, and two counts of Battery, as Class C felonies. After a three day trial, a jury found Akard guilty as charged. The trial court sentenced Akard to an aggregate sentence of ninety-three years.

Akard now appeals.

## Discussion and Decision

### I. Admission of Pornography

■ First, Akard argues that the trial court abused its discretion in admitting pornographic pictures recovered from his laptop and a picture torn from a magazine because such items were inadmissible pursuant to Indiana Evidence Rule 404(b). Admission of evidence is within the sound discretion of the trial court. *Amos v. State*, 896 N.E.2d 1163, 1167 (Ind.Ct.App. 2008), *trans. denied.* We consider any conflicting evidence most favorable to the trial court's ruling and any uncontested evidence favorable to the defendant. *Taylor v. State*, 891 N.E.2d 155, 158 (Ind.Ct. App.2008), *trans. denied, cert. denied,* ——— U.S. ———, 129 S.Ct. 1008, 173 L.Ed.2d 301 (2009), *reh'g denied,* ——— U.S. ———, 129 S.Ct. 1665, 173 L.Ed.2d 1032 (2009). We

will only reverse a decision of the trial court to admit evidence if there is an abuse of such discretion. *Amos*, 896 N.E.2d at 1167. An abuse of discretion occurs if the trial court's decision is against the logic and effect of the facts and circumstances before the court. *Id.* at 1168.

■ Indiana Evidence Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . .

In its determination of admissibility of the evidence, the trial court must: (1) determine whether the evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) balance the probative value of the evidence against its prejudicial effect. *McClendon v. State*, 910 N.E.2d 826, 832 (Ind.Ct.App.2009), *trans. denied*. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Ind. Evidence Rule 403.

■ The pictures admitted as State's Exhibit 154 are pornographic images selected from Akard's computer that depict females of various ages that are bound and gagged, similar to A.A.'s description of how Akard bound her. At trial, Akard conceded that the pictures had "some basic relevance," but argued that the pictures unfairly prejudiced him because some depict young girls. Tr. at 333. These pictures have more relevancy than conceded. The Exhibit 154 pictures are probative of Akard's plan to make A.A. resemble the pictures stored on the laptop. It is undisputed that A.A.'s genitalia had been shaved during the incident and that she is petite, standing only five feet tall and weighing ninety pounds. A.A. also testified that at some point she woke to find stockings on her legs. During the incident, Akard even looked at some of the pictures. Due to the similarity between the pictures' content and what Akard did to A.A., the danger of unfair prejudice that may have resulted from the exhibit does not substantially outweigh the probative value. Therefore the trial court did not abuse its discretion in admitting Exhibit 154.

■ The second exhibit challenged is a magazine page, depicting adults urinating on each other, found on the bedroom floor during the search of Akard's apartment. A.A. testified that while in the shower Akard urinated in her mouth. Clearly, the evidentiary purpose of the exhibit was to demonstrate Akard's character and propensity to commit such an act as there was contradiction between A.A.'s and Akard's testimony regarding whether such an act occurred. However, this alleged event was not a basis for any crime charged or resulting conviction. Thus, any evidence of this alleged shower incident had no relevance to the charges tried. While Akard objected to the admission of the magazine page, he lodged no objection as to A.A.'s testimony regarding her account of this particular event. Nonetheless, in light of the voluminous evidence supporting the charges actually tried, Akard has not shown that inclusion of the evidence surrounding this event or the scant irrelevant evidence, erroneously admitted, was so prejudicial as to make a fair trial impossible.

## II. Post–Arrest, Pre–Miranda Silence

■ Second, as he failed to make a contemporaneous objection, Akard con-

tends that it was fundamental error when the State elicited testimony regarding his silence when he was arrested, constituting a violation of his Fifth Amendment right to remain silent. Although Akard's claim is procedurally defaulted by the failure to object, appellate courts may, on rare occasions, review defaulted claims on the basis of fundamental error. *See Jewell v. State,* 887 N.E.2d 939, 942 (Ind.2008). "[F]undamental error is extremely narrow and available only when the record reveals a clearly blatant violation of basic and elementary principles, where the harm or potential for harm cannot be denied, and which violation is so prejudicial to the rights of the defendant as to make a fair trial impossible." *Id.*

Akard's silence while the police were entering his apartment was mentioned four times during trial: briefly during the prosecutor's opening and closing arguments and during the testimony of two police officers in the State's case-in-chief. Questions asked of the two officers were whether Akard made any statements or asked any questions when he was arrested to which both officers responded in the negative.

 The Fifth Amendment to the U.S. Constitution, made applicable to the states through the Fourteenth Amendment, provides that no person shall be compelled in any criminal case to be a witness against himself. *Cox v. State,* 854 N.E.2d 1187, 1193 (Ind.Ct.App.2006). A suspect is informed of this right to remain silent, among others, when given what is commonly known as the *Miranda* rights.[1] While it is a violation of the Fifth Amendment to compel a suspect to answer ques-

tions, merely using as evidence of guilt that the suspect remained silent during police questioning can be a violation. *See United States v. Hernandez,* 948 F.2d 316, 322 (7th Cir.1991). Determining whether the use of the defendant's silence is a violation of the Fifth Amendment turns on the manner in which the prosecution used the evidence and if the silence was before or after the defendant was read the *Miranda* rights.

In *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the U.S. Supreme Court held that using a defendant's silence, which occurred after arrest and receiving *Miranda* warnings, for impeachment purposes violates the Due Process Clause of the Fourteenth Amendment. *Id.* at 619, 96 S.Ct. 2240. The underlying rationale was that use of a defendant's post-arrest, post-*Miranda* silence to impeach an explanation subsequently offered at trial would be contrary to the *Miranda* warnings' implicit assurance to an individual in police custody that silence will carry no penalty. *Id.* at 618, 96 S.Ct. 2240. The U.S. Supreme Court distinguished *Doyle* when it addressed the facts in *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982). *Fletcher* involved the use of post-arrest silence of the defendant by the state to impeach the defendant's theory of self-defense that was belatedly advanced at trial. *Id.* at 603–04, 102 S.Ct. 1309. In distinguishing *Doyle,* the Supreme Court reasoned that the "significant difference between the present case and *Doyle* is that the record does not indicate that [the defendant] received any *Miranda* warnings during the period in which he remained silent immediately after his ar-

---

1. *See Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ("He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a

court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.").

rest." *Id.* at 605, 102 S.Ct. 1309. Relying on this difference, the Court held that, absent the implicit assurance embodied in *Miranda* warnings, impeachment by prior silence is permissible. *Id.* at 606–07, 102 S.Ct. 1309.

Here, the State used Akard's post-arrest, pre-*Miranda* silence as substantive evidence in its case-in-chief as opposed to impeaching the defendant on cross-examination. The Seventh Circuit addressed this scenario in *United States v. Hernandez* and concluded that, even if the defendant testifies at trial, it is a violation of the Fifth Amendment for the State to introduce evidence of the defendant's post-arrest, pre-*Miranda* silence in its case-in-chief. *Hernandez*, 948 F.2d at 323. Thus, the questions directed to the police officers regarding Akard's silence after his arrest but before being read his rights were used as an improper inference of Akard's guilt, in violation of the Fifth Amendment.

 This does not end our inquiry as a federal constitutional error can be harmless error if the reviewing court can declare that the error was harmless beyond a reasonable doubt. *Id.* A harmless error conclusion requires a court to determine "whether there is a reasonable possibility that the [errors] complained of might have contributed to the conviction." *Id.* (quoting *United States ex rel. Ross v. Fike*, 534 F.2d 731, 734 (7th Cir.1976)). Such a conclusion may be warranted when other evidence of guilt is overwhelming or when the impact of the objectionable material was negligible. *Id.* However, when the issue is raised in terms of fundamental error, a defendant must demonstrate that the error worked to his actual and substantial disadvantage, infecting and tainting the entire trial. *Ouska v. Cahill–Masching*, 246 F.3d 1036, 1050 (7th Cir. 2001).

While Akard argues that this line of testimony violated his constitutional rights, he does not argue how these few references worked to his actual and substantial disadvantage, creating the impossibility of a fair trial. Moreover, the brevity of these references in comparison to the other substantial evidence presented to prove Akard's guilt, including the taser marks on A.A. and the physical evidence found at Akard's apartment corroborating A.A.'s testimony, leads us to the conclusion that the brief mention of his pre-*Miranda* silence does not rise to the level of fundamental error.

### III. Appropriateness of Sentence

 Before addressing the final argument regarding sentencing, we note that the sentences given for several of the convictions are below the statutory minimum. For Count III, Rape, as a Class A felony, and Count V, Criminal Deviate Conduct, also as a Class A felony, the trial court assigned, for each count, a sentence of twelve years, which is below the minimum sentence of twenty years for a Class A felony. *See* Ind.Code § 35–50–2–4. Also, for Counts IX and X, Battery, as Class C felonies, Akard received sentences of one year for each count, which is below the minimum sentence of two years for a Class C felony. *See* Ind.Code § 35–50–2–6. To comport with the statutory requirements, we remand with instructions for the trial court to enter a sentence of forty years on each of Counts III and V, and enter two years on each of Counts IX and X. This would result in the aggregate sentence of ninety-four years.

 Finally, Akard contends that his aggregate sentence, now ninety-four years, is inappropriate. In *Reid v. State*, the Indiana Supreme Court reviewed the standard by which appellate courts independently review criminal sentences:

Although a trial court may have acted within its lawful discretion in determining a sentence, Article VII, Sections 4 and 6 of the Indiana Constitution authorize independent appellate review and revision of a sentence through Indiana Appellate Rule 7(B), which provides that a court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender. The burden is on the defendant to persuade us that his sentence is inappropriate.

*Reid v. State,* 876 N.E.2d 1114, 1116 (Ind. 2007) (internal quotation and citations omitted).

More recently, the court reiterated that "sentencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State,* 895 N.E.2d 1219, 1222 (Ind.2008). Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented. *See id.* at 1224. One purpose of appellate review is to attempt to "leaven the outliers." *Id.* at 1225. "[W]hether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id.* at 1224.

The trial court sentenced Akard, with the revisions mentioned above, to the following: Count I, Rape as a Class B felony, 12 years; Count II, Rape as a Class A felony, 40 years; Count III, Rape as a Class A felony, 40 years; Count IV Criminal Deviate Conduct as a Class B felony, 12 years; Count V, Criminal Deviate Conduct, as a Class A felony, 40 years; Count VI, Criminal Deviate Conduct as a Class A felony, 40 years; Count VII, Count VIII, Criminal Confinement as a Class B felony, 12 years; Count IX, Battery as a Class C felony, 2 years, and Count X, Battery as a Class C felony, 2 years. The following groups of convictions were ordered to be served concurrent to those within the group and the groups to be served consecutive to each other: Counts I, II, III and Counts IV, V, VI and Counts VII and VIII, and Counts IX and X. This results in an aggregate sentence of ninety-four years. For a Class A felony, the sentencing range is twenty to fifty years, with thirty years as the advisory. Ind.Code § 35–50–2–4. A Class B felony has a sentencing range of six to twenty years, with ten years as the advisory. Ind.Code § 35–50–2–5. Finally, the sentencing range for a Class C felony is two to eight years, with four years as the advisory. Ind.Code § 35–50–2–6. Thus, for almost every count, the sentence assigned was above the advisory but less than the maximum sentence for the particular class of felony. However, the trial court lessened the aggregate sentence by ordering the groups of convictions to run concurrent to each other.

As to the nature of the offense, Akard played on A.A.'s sympathy and lured A.A. to his apartment by requesting her aid to purportedly avoid apprehension for being intoxicated while in public. Once Akard locked A.A. in his apartment, he forced A.A. to perform numerous sex acts against her will while being threatened with weapons and statements that he would kill her. Akard used a stun gun on A.A. several times to subdue her to his will as well as hitting her in the head numerous times. To further render A.A. incapacitated, Akard forced a cocktail of prescription and over the counter drugs down A.A.'s throat. Throughout the horrendous ordeal, Akard used handcuffs, zip ties, rope and a metal linked chain to restrain A.A. as he subjected her to numerous unspeakable violent

acts. While A.A. was confined, Akard cut off A.A.'s clothes and forced her to shower, presumably to dispose of biological evidence.

As to the character of the offender, Akard has a criminal history indicating that he has received leniency from courts in the past. In 2000, Akard was charged in Georgia with Carrying a Concealed Weapon, Aggravated Assault, and Obstruction of Officers. He was sentenced to five years, which were suspended to probation. However, on January 23, 2003, Akard was "discharged with no finding of guilty under the Georgia First Offender Act." Presentence Investigation Report at 3. In 2001, Akard was convicted of Reckless Driving in Georgia and the next year, he was convicted of Operating a Vehicle While Intoxicated, as a Class A misdemeanor in Indiana. In 2003, Akard was charged with Battery by Bodily Waste and False Informing for which Akard received a one year pretrial diversion. In 2007, Akard was convicted on federal charges of Receiving a Visual Depiction of Minor Engaged in Sexually Explicit Conduct, as a Class C felony.

Akard requests that we revise his sentences so that all his sentences run concurrently, decreasing his aggregate sentence to forty years. In *McCullough v. State,* the Indiana Supreme Court held that when a defendant requests review of his sentence under 7(B), "the reviewing court is presented with the issue of whether to affirm, reduce or increase the sentence." *McCullough v. State,* 900 N.E.2d 745, 750 (Ind.2009). In his concurring opinion, Justice Boehm agreed and went a step further, stating that "we should forthrightly state that although we have that power [to revise a sentence upwards], we have never exercised it and do not expect to exercise it in the future except in the most unusual case." *Id.* at 751, (J. Boehm concurring).

This case is a most unusual case. Here, Akard chose to victimize one of those among us that is most vulnerable. Along with children, the homeless are individuals who are susceptible to being abused as they live on the fringes of society, barely able to acquire the necessities of life. This is not what makes this case most unusual. Rather, it is Akard's demented purpose in attempting to satisfy his prurient interests in child bondage-style rape by performing similar acts on a homeless woman who possessed physical characteristics akin to those of a child.

At the time of the attack, A.A. stood only five feet tall and weighed approximately ninety pounds. Akard described A.A. as "bouncy and energetic" and confessed that he liked girls who were "bouncy and energetic and young." Tr. at 420, 487. In the array of things to which Akard subjected A.A., Akard shaved her pubic hair, dressed her in child-like stockings and just happened to have a bra that fit A.A. to replace the one he cut from her. Additionally, Akard had a cache of women's undergarments mostly patterned in bright colors and flowery patterns. State's Exhibit 129–133. A number of the pairs of underwear had two hand-cut openings. Also among this stockpile was a package of size medium "Girls' Fashion Pantyhose" for ages "4–6." State's Exhibit 129.

Bringing clarity to Akard's hideous plan and motive are the properly admitted pornography pictures from his laptop. Not only did these images bolster A.A.'s credibility as to what occurred during her night of captivity but they establish Akard's prurient interest toward children. Akard showed A.A. many of the pornographic pictures on his laptop, including pictures of young children in bondage style poses. During this display, Akard made comments such as, "he would like to walk into someone's [sic] else [house] and wake them up and have sex with his kids—their kids" and "he's done plenty [of children]." Tr.

at 100. A.A. also testified that some of the pictures Akard showed her appeared to depict Akard having sex with a two-year-old child and another where a young child was tied in a bondage position and the child looked lifeless.

The violence and sinister mentality associated with an individual raping an adult is serious and disturbing. However, when these acts are premeditated, motivated and purposely carried out to satisfy an even more diabolical interest, the rape of an adult is indescribably more heinous.

Based on Akard's character and the nature of the offenses, we conclude that this is a most unusual case that warrants the extreme rarity of this Court invoking its authority to revise a defendant's sentence upward. We revise Akard's sentence to an aggregate of 118 years imprisonment by ordering Counts I and IV to be served consecutively to the other Counts.

We affirm the convictions, revise the sentences and remand with instructions.

BAKER, C.J., and ROBB, J., concur.