## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 06 2017, 9:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ross G. Thomas
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Dennis Meadows,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | December 6, 2017<br><br>Court of Appeals Case No.<br>61A01-1608-PC-1762<br><br>Appeal from the Parke Circuit Court<br><br>The Honorable Sam A. Swaim, Judge<br><br>Trial Court Cause No.<br>61C01-1510-PC-350 |

**Brown, Judge.**

[1] Dennis Meadows appeals the denial of his petition for post-conviction relief. He raises two issues which we revise and restate as whether he was deprived of effective assistance of counsel at his competency hearing and trial. We affirm.

## *Facts and Procedural History*

[2] The relevant facts as discussed in Meadows's direct appeal follow:

> Jeremy Hubble ("Hubble") attended a classmate's party at Raccoon Lake in Parke County. After attending the party, Hubble told his uncle, Meadows, that there was a golf cart at the house where the party was held. In the early morning hours of February 8, 2006, Meadows drove Hubble out to the house where the party had taken place. One of the two of them kicked in the door of Michael Fishero's ("Fishero") house once they arrived. They found a golf cart and a John Deere riding lawnmower in the garage.
>
> The two then walked to the pole barn located next door and broke into that building, which belonged to Edward Helms ("Helms"). They took several tools from the barn including a floor jack, air compressor, a DeWalt tool pack, a pressure washer, socket set, extension cords, and gas cans, among other things. Hubble and Meadows loaded these items into the bed of Meadows's truck and drove to Meadows's home to hitch up his trailer. Once at Meadows's home they hooked up a red, tandem-axle, box trailer to his truck and returned to Fishero's house. They passed Lana Bunting's ("Lana") house on their way to Fishero's house. Lana, who is Meadows's sister, called Detective Justin Cole ("Detective Cole") of the Parke County Sheriff's Department at approximately 7:30 a.m. and left a message for him that Meadows and her cousin, Hubble, had just driven past her house towing a red trailer.

When Meadows and Hubble arrived at Fishero's house, they loaded the golf cart and the lawnmower into the trailer. They walked to another neighbor's house, broke the window, and went inside, but found nothing that they wanted to steal. They returned to Meadows's house and unhooked the trailer. Hubble and Meadows then drove to Meadows's rental house near Shades State Park.

Detective Cole listened to the messages left on his voicemail at around 8:30 a.m. He spoke with Chief Deputy Bill Todd of the Parke County Sheriff's Department, who had investigated the burglaries earlier that day. Detective Cole and Chief Deputy Eddie McHargue, also of the Parke County Sheriff's Department, went to Meadows's house. Meadows's work truck and the red trailer were in the front of the house, but no one was at home. Detective Cole noticed Hubble's brother, Seth, watching them from around the corner of the house and talking on a cordless telephone. Detective Cole asked Seth if he would let Meadows know that they were looking for him and that Detective Cole wanted to speak to him.

Seth had been speaking with Meadows on the cordless telephone when the officers were looking for Meadows at his house. After Seth's telephone call, Meadows and Hubble loaded all of the stolen tools in Meadows's truck and began driving around, trying to decide what to do with the stolen items. Detective Cole and Deputy McHargue drove to Richard Brown's house, because Meadows was known to spend time there. When they were about 200 yards from the house, they spotted Meadows's white pickup truck traveling southbound toward Waveland, Indiana. The officers attempted to catch up to the pickup, but Meadows had seen them and "floored it." Tr. at 64. Meadows was able to evade the officers and pulled his truck to the side of a road near a tree line. He and Hubble then threw the stolen items into the trees. While disposing of the stolen items, Hubble lost his cell phone and some cigars in a ditch. Meadows and Hubble then

drove to Parkersburg, Indiana. Detective Cole subsequently located the abandoned, stolen items on the side of the road and called the Montgomery County Sheriff's Department to recover the evidence.

When Hubble and Meadows arrived in Parkersburg, Indiana, they called Ronald Ruffner ("Ruffner"). Meadows asked Ruffner to go to Meadows's house, retrieve the red box trailer, and take it somewhere out of his driveway. Hubble and Meadows left a ball hitch of the appropriate size behind a business in Parkersburg and told Ruffner where he could locate it. Meadows and Hubble then drove to Pittsboro, Indiana.

Detective Cole then returned to Meadows's house and set up surveillance. At approximately 5:30 p.m., Ruffner pulled into Meadows's driveway, hooked up the box trailer, and drove away. Deputy Justin Salisbury, of the Parke County Sheriff's Department, had been alerted to watch for the trailer, and saw Ruffner pulling the trailer. Deputy Salisbury noted that the trailer did not have functioning taillights. Deputy Salisbury initiated a traffic stop of Ruffner, who was unable to produce a registration certificate for the trailer. The license plate for the trailer was for a different trailer. More specifically, the license plate was registered to Meadows and his wife for a black 2005 trailer, and Ruffner was towing a red box trailer. Ruffner told Deputy Salisbury that the trailer belonged to Meadows. Deputy Salisbury asked Ruffner to call Meadows, and Ruffner placed the call. Deputy Salisbury asked for the telephone number so that he could telephone Meadows himself. Meadows never returned the telephone call.

The locks were cut off of the trailer and its contents were inventoried. The trailer contained the golf cart and lawnmower stolen from Fishero's residence.

*Meadows v. State*, No. 61A01-1009-CR-483, slip op. at 2-5 (Ind. Ct. App. April 14, 2011), *trans. denied*.

[3] On October 9, 2008, the State charged Meadows with three counts of burglary as class B felonies. In February 2009, Attorney Don Darnell was appointed to represent Meadows. On July 27, 2009, Attorney Darnell filed a Motion for Psychiatric Examination to Determine Competence to Stand Trial, and on September 4, 2009, the court granted the motion and appointed Dr. Michael Murphy and Dr. David Hilton to conduct an examination of Meadows.

[4] In his report dated October 22, 2009, Dr. Murphy wrote that Meadows did not have confidence in the capacity of his attorney to defend him and wrote the following under the heading Competency to Stand Trial:

> During the evaluation, Mr. Meadows displayed the capacity to understand the charges against him and had an appreciation of the range and nature of potential penalties. He evidenced an appropriate appraisal of the offenses he is charges [sic] with and the potential penalties. He has knowledge of the role of defense counsel, prosecuting attorney, judge, jury, defendant, and witnesses. He has the capacity to understand trial procedure.
>
> The primary difficulty in Mr. Meadows [sic] competence to stand trial arise as a consequence of his irritability, low mood, depression, and oppositionality that arise from major depressive disorder. The symptoms and disorder substantially impair his capacity to assist and cooperate with his attorney in planning legal strategy for his defense and he cannot disclose to his attorney available pertinent fact surrounding the offense in a helpful and accurate manner. His condition impairs his ability to testify accurately and relevantly and realistically challenge

prosecution witnesses. He has not been taking medication that would effectively treat his symptoms and he is in need of psychiatric treatment.

Direct Appeal Appellant's Appendix Volume II at 119.

In Dr. Hilton's report filed on December 30, 2009, he mentioned that Meadows had a "very poor relationship with his attorney" and that he did not trust Attorney Darnell. *Id.* at 131. The report stated:

> I can not specifically address this defendant's capacity to disclose information to his attorney, but based on his ability to answer questions not specific to his cases today, I have no evidence to suggest he would have an impairment in this area.
>
> Mr. Meadows had the ability to realistically challenge prosecution's witnesses. He believed that Jeremy Wilkinson-Hubble will testify falsely against him in court, stating that Hubble has given police false information. He stated that, if someone did testify falsely against him, he would try to get his attorney to make them tell the truth.
>
> There was no evidence based on today's evaluation to suggest that Mr. Meadows does not have the ability to testify relevantly should he choose to do so.

*Id.* at 132. Dr. Hilton's report concluded:

> In conclusion, I can not render a definitive opinion regarding the issue of criminal responsibility. Mr. Meadows' refusal to discuss the details of his case limits my ability to comment on his capability of appraising legal defenses. In addition he has a very adversarial relationship with his defense counselor. Otherwise, it

is my opinion, within reasonable medical certainty, that Mr. Meadows does have sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and rational, as well as factual understanding of the proceedings against him.

*Id.* at 133.

[6] On January 5, 2010, the court held a hearing on Meadows's competency to stand trial. Attorney Darnell noted the reports, stated that Dr. Hilton's report indicated that Meadows stated that he did not have any confidence in him as his trial counsel, and asked that his appearance be withdrawn and that the court appoint a new attorney. The court stated that it was going to tell the parties what it was inclined to do and that appeared Meadows would benefit from placement at Logansport. The prosecutor stated that Meadows did not meet the legal standard for incompetency and that Meadows was just depressed because he was facing prison time. Attorney Darnell then stated that Meadows had something he wanted to say, and Meadows stated:

> Your Honor, I'm in the --- I'm fully competent to stand trial. Yeah, I'm depressed. I'm in a bad situation and I'd just done a year at the worst prison in the State of Indiana, and my wife just left me and I feel I've got a prosecutor for an attorney and, I mean there's --- and I understand everything that's going on and you know, I'm just --- it's, you know, it's right around the holidays. It's a tough position and, you know, my family's working on trying to hire me an attorney, and I feel that the client-attorney relationship between me and Mr. Darnell has deteriorated to the point where we can't proceed in a professional manner. Every piece of advice he gives me, I decline it just because I feel I don't trust him. Medication won't --- and I was

on medication whenever I was at the farm and I was just depressed and --- but I understand everything that's going on and I understand that --- and I've asked for certain documents from Darnell and I haven't got them and we just --- we just keep butting heads on things and he brought me a plea, didn't explain everything to me and then the plea was rejected from the State, so I just feel that --- that the relationship between Darnell and I is just at the point where we can't proceed and I --- so far I haven't talked to my sister to find out whether she has got the money for an attorney, but she --- I feel very confident that she can, and then we'll be able to proceed.

Petitioner's Exhibit 2 at 5-6.

[7] The court then stated:

[A]fter hearing what you've just said, and the way that you're able to speak, you're able to convey pretty clearly what your wishes are, and you show an understanding of what's going on and what your attorney is --- what you expect your attorney to do. So I think I'm going to go ahead and find that you are competent to stand trial and ready to proceed, and I'll give you one change of attorney. You understand that this delay in the trial is going to be attributable to you.

*Id.* at 6-7. Meadows answered: "Yes, sir." *Id.* at 7. In January 2010, the court withdrew the appointment of Attorney Darnell and appointed Attorney James Bruner to represent Meadows.

[8] On July 9, 2010, the State amended Count I to burglary as a class C felony and that same month, the court conducted a jury trial. During trial, the following

exchange occurred between the prosecutor and Detective Cole regarding his preliminary conversation with Meadows via cell phone:

Q  How did the conversation start out?

A  I told him who I was, informed him of my identity and my employment, asked him if he would open his trailer for us.

Q  And did he – what was his reply to that?

A  He said that I'd just as soon not until I talk to my attorney.

Q  What was the next thing that you asked Mr. Meadows?

A  I'd asked him why.  He said he was not really sure what's going on.

Q  What was the next thing that you guys talked about?

A  I then asked him what was in his trailer and his reply was, "I better talk to my attorney first."

* * * * *

Q  Did he say anything else?

A  He denied seeing the gray unmarked police car that I had been in with Eddie McHargue.  He also said that he'd been driving an S-10 pick-up, which is a smaller pick-up, around that day and not a red and white Ford truck.  I asked him if anybody could verify his whereabouts just trying to get – see if there was anybody that could verify what he was telling me, and he said no, then he said

he needed to get with an attorney before he identified anybody that could verify his whereabouts.

Trial Transcript at 180-181.

[9] The court admitted a twenty-minute recording of relevant portions of a telephone call between Detective Cole and Meadows that occurred in March 2008 after Hubble had been arrested. In the recording, Meadows stated that Meadows could call his attorney, asked Detective Cole if his attorney could call him, talked about his attempts at reaching his attorney, discussed turning himself in, and stated that a cleanup statement could be one small thing he could help out on and that he appreciated Detective Cole calling him back. The court also admitted an October 15, 2009 recording of an inmate phone call from Meadows in which Meadows stated he wanted to "get" certain houses, that his sister Lana wants to run her mouth, and that he was chased down the highway. State's Exhibit 74 at 0:30-1:10.

[10] During closing argument, the prosecutor stated in part: "While Detective Cole was talking to Mr. Meadows on the phone he refuses to tell him where he's at. He gives a lot of cock and bull stories about when he was driving that white and red Ford F-150 and when he wasn't." *Id.* at 220-221. Meadows's trial counsel commented on Meadows's discussions with his counsel and Detective Cole in his closing argument. Specifically, he stated:

> So Jeremy Hubble is arrested and he's at the Parke County Jail February 28th of 2008. Mr. Meadows has already been talking to an attorney. Mr. Meadows calls and has this conversation

regarding a cleanup statement with Detective Cole in which he talks about his involvement, and they talk about what will happen and Cole explains to him what a cleanup statement is and [Meadows] talks about the difficulty that he was having getting in touch with Brett Gibson, who was his attorney at the time. He tells Mr. Cole why don't you try to call Mr. Gibson too. Why don't you give the Prosecutor Mr. Gibson's name and perhaps they can get in touch with him if they want to. The conversation ends with I'll try to call him and you try to call him too. What did [Meadows] think was going to happen? Well during that conversation there was also discussion about whether or not [Meadows] and his attorney needed to talk to the Parke County Prosecutor or the Montgomery County Prosecutor. There was discussion between Cole and – Detective Sergeant Cole and [Meadows] regarding a jail time and/or in home detention. [Meadows] did not believe that he was going to be charged with these burglaries and there's a very simple reason why. He didn't commit the burglaries. It's part of the reason why there's such this wide timeline before they ever go ahead and try to take their shot at let's charge him and see what happens.

*Id.* at 226-227. Meadows's trial counsel also argued to the jury:

Discuss very carefully the evidence of the conversation between [Meadows] and Officer Cole about the cleanup statement. When poor old naive [Meadows] he's getting nervous because he had an attorney representing him on this, but when he – when he'd been waiting and it's been, by the time that Mr. Hubble is picked up, it's been two years and 20 days of waiting, not knowing whether they're going to try to blame him for the burglary or whether he's going to be charged with possession of the stolen property in Parke County or whether he's going to be charged with possession of stolen property in Putnam County. He's got lawyers. He's tried to call the lawyer. He's particularly trying to call a lawyer when he sees there's finally some movement in the

case, that Mr. Hubble's been picked up, he can't get in touch with him so he gets in touch with Cole and asks him what about a cleanup statement, what am I looking at, tells him about the people that he has been involved with who are threatening. And he's expecting that he's looking at possession of stolen property.

\* \* \* \* \*

Those burglaries were committed by Hubble. Mr. Meadows has some culpability. (Indiscernible.) It's why he had a lawyer to negotiate for him. (Indiscernible) it's expected to be charged with the right thing.

*Id.* at 239-242.

[11] During rebuttal, the prosecutor stated:

The conversations with Mr. Meadows on that particular day when they are getting a search warrant for his actual house, Detective Cole, when he got a hold of him that night, said would you mind opening your trailer for me. He said I'd just as soon not until I talk to my attorney. When asked why he said he's really not sure what was going on. When asked what was in his trailer [Meadows] said I better talk to my attorney first. Meadows said that he'd been involved with Jeremy – or had seen Jeremy Hubble earlier that day, but wasn't hanging out with him at the current time that he talked to Cole that night shortly before 12:00. Meadows confirmed that he was still in the same pick-up truck, but wouldn't disclose his whereabouts.

*Id.* at 246.

[12] The jury found Meadows guilty as charged. The court sentenced him to six years for Count I, twelve years each for Counts II and III, and ordered the sentences to be served consecutively for an aggregate sentence of thirty years.

[13] On direct appeal, Meadows claimed that the warrantless search of his trailer violated the protections provided by the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. *Meadows*, slip op. at 5. This Court affirmed, held that Deputy Salisbury was required to take the trailer into his custody and that a search warrant was not required to conduct an inventory of the impounded vehicle, and noted that "[e]ven if the evidence had been erroneously admitted, Hubble testified to the events in question and the evidence found in the trailer was cumulative and corroborative of that testimony." *Id.* at 10.

[14] On October 23, 2015, Meadows filed a petition for post-conviction relief alleging that he received ineffective assistance of counsel for multiple reasons including that his counsel sought to withdraw during the competency hearing "essentially allowing [him] to represent himself at the hearing." Post-Conviction Appendix Volume II at 7.

[15] On March 24, 2016, the court held a hearing. Attorney Darnell testified that he received a copy of the transcript of the January 5, 2010 hearing, but that he did not recall that particular hearing. When asked if he recalled when Meadows asked him if he could speak, Attorney Darnell answered in part: "[P]robably Mr. Meadows was talking in my ear at the time I'm talking to the Judge, and

that's probably when he said I want to talk to the Judge, or something. That's my best guess of how that came about." Post-Conviction Transcript at 14. Meadows's trial counsel, Attorney Bruner, testified that he had practiced law for thirty-three years, that Meadows had several cases pending, and that he had extensive conversations with Meadows that would have included "both his right to and strategy discussions in determination as to whether or not it was in his best interest to testify at his trials." *Id.* at 23. Meadows's post-conviction counsel showed Attorney Bruner page 180 of the trial transcript regarding Meadows's statement about talking to his attorney, and Attorney Bruner stated that he had no independent recollection of it. When asked if his testimony would be that he did not feel that there was a valid objection or that he had a strategic reason for not objecting, Attorney Bruner answered:

> To the --- to the question related to him indicating that maybe he should talk to an attorney first. Mr. Meadows had had conversations with the police officers where he had maintained his innocence in these matters. I felt that with --- that at some point in time, a jury would expect that a reasonably prudent person is going to cooperate with the police to some extent, but then say maybe I need to talk to a lawyer.

*Id.* at 28. He testified that he did not recall a strategic reason for not objecting to the prosecutor's closing argument. When asked if he had done any research about the admissibility of pre-arrest silence prior to trial, Attorney Bruner answered affirmatively. On cross-examination, Attorney Bruner testified that Meadows understood the charges and that there were not any issues as to Meadows's ability to participate in the trial. Meadows testified that he wanted

to speak at the competency hearing but he did not want to represent himself and never indicated to Attorney Darnell that he wanted to represent himself.

[16] On July 8, 2016, the court denied Meadows's petition for post-conviction relief. The court's order states:

FINDINGS OF FACT

1. In regards to the ineffective assistance of counsel at the Petitioner's Competency Hearing, this Court would note that the report of Michael Murphy, Ph.D. stated that:

"Mr. Meadows displayed the capacity to understand the charges against him and had an appreciation of the range and nature of potential penalties. He evidenced an appropriate appraisal of the offenses [he is charged] with and the potential penalties. He has knowledge of the role of defense counsel, prosecuting attorney, judge, jury, defendant, and witness. He has the capacity to understand trial procedure."

2. In addition, the report of David K. Hilton, MD stated:

"Otherwise, it is my opinion, within reasonable medical certainty, that Mr. Meadows does have sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and rational, as well as factual understanding of the proceedings against him".

3. Additionally, the Court itself spoke at length with [Meadows] at the competency hearing before making its determination.

4. Finally, the Court would note that [Meadows] was tried and found guilty under an unrelated cause number with a completely

different attorney in the time period following the Competency Hearing and the trial that is the basis for the instant Post Conviction Relief. During this intervening period, neither Defense Counsel nor [Meadows] voiced any continuing concerns about [Meadows's] competency.

5. The alleged improper testimony claimed by [Meadows] referred to statements made by [Meadows] before he was either arrested or in custody. . . .

* * * * *

6. The entire exchange between Detective Cole and [Meadows] is encompassed on pages 179 to 183 of the Transcript. During this testimony, it is apparent that [Meadows] was more than willing to answer some questions posed by Detective Cole. Furthermore, as noted above, if a person is not in custody, police are not required to honor a request for counsel and cease questioning. *Bean v. State*, 973 N.E.2d 35, 40 (Ind. Ct. App. 2012)[, *trans. denied*.]

7. When reviewed in the full context, it is apparent that there is no direct or indirect implication to be drawn from this line of questioning. Neither the deputy prosecutor nor the witness dwell on this exchange and no follow up questions are asked as to what conclusions the witness (or the jury) should draw. The testimony is merely a sequence of questions regarding the conversation between Detective Cole and [Meadows].

8. Likewise, during the rebuttal closing, the Deputy Prosecutor merely summarizes this exchange within the context of the full interview but does not imply or ask the jury to draw any conclusions as to such statements being evidence of guilt on the part of [Meadows]. The State made no comment on [Meadows's] pre-arrest silence, refusal to answer specific

questions, and never implied that requesting an attorney when being questioned about a crime was evidence of guilt.

CONCLUSIONS OF LAW

* * * * *

7. The Court finds that no prosecutorial misconduct was committed by the line of questioning and that trial counsel was not ineffective for his failure to object thereto.

8. Alternatively, even if such testimony could be deemed inappropriate, [Meadows] has not proven that the minimal testimony and brief statement in closing satisfies the prejudice prong of an ineffective assistance of counsel claim. A review of the full transcript clearly displays that the outcome of the trial would not have been different. The evidence, including testimony by the co-defendant, was overwhelming.

Post-Conviction Appendix Volume II at 50-53.

## Discussion

Before discussing Meadows's allegations of error, we note the general standard under which we review a post-conviction court's denial of a petition for post-conviction relief. The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004); Ind. Post-Conviction Rule 1(5). When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. 810 N.E.2d at 679. On review, we will not reverse the judgment unless the evidence as a whole

unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court. *Id.* Further, the post-conviction court in this case entered findings of fact and conclusions thereon in accordance with Indiana Post-Conviction Rule 1(6). *Id.* "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Id.* In this review, we accept findings of fact unless clearly erroneous, but we accord no deference to conclusions of law. *Id.* The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Id.*

[18] The issue is whether Meadows was denied effective assistance of counsel. Meadows argues that he received ineffective assistance at his competency hearing and at trial. Generally, to prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), *reh'g denied*). A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. *Id.* "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different. *French*, 778 N.E.2d at 824. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Perez v. State*, 748 N.E.2d 853, 854 (Ind. 2001). Failure to satisfy either prong will cause the claim to fail. *French*, 778 N.E.2d at 824. Most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone. *Id.*

[19] When considering a claim of ineffective assistance of counsel, a "strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Morgan v. State*, 755 N.E.2d 1070, 1072 (Ind. 2001). "[C]ounsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." *Williams v. State*, 771 N.E.2d 70, 73 (Ind. 2002). Evidence of isolated poor strategy, inexperience, or bad tactics will not support a claim of ineffective assistance of counsel. *Clark v. State*, 668 N.E.2d 1206, 1211 (Ind. 1996), *reh'g denied*, *cert. denied*, 520 U.S. 1171, 117 S. Ct. 1438 (1997). "Reasonable strategy is not subject to judicial second guesses." *Burr v. State*, 492 N.E.2d 306, 309 (Ind. 1986). We "will not lightly speculate as to what may or may not have been an advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best." *Whitener v. State*, 696 N.E.2d 40, 42 (Ind. 1998). In order to prevail on a claim of ineffective assistance due to the failure to object, the defendant must show a reasonable probability that the objection would have been sustained if made. *Passwater v. State*, 989 N.E.2d

766, 772 (Ind. 2013) (citing *Wrinkles v. State*, 749 N.E.2d 1179, 1192 (Ind. 2001), *cert. denied*, 535 U.S. 1019, 122 S. Ct. 1610 (2002)).

## A. *Competency Hearing*

[20] Meadows argues that he received ineffective assistance of counsel at his competency hearing because his counsel failed to object to the hearing proceeding after counsel had moved to withdraw, and that counsel failed to protect his client by not continuing to represent Meadows's interests at the hearing.[1] The State argues that neither of the doctors that evaluated Meadows before the competency hearing definitively concluded that he was incompetent to stand trial and that trial counsel appointed after Attorney Darnell's withdrawal had extensive discussions with Meadows before trial and did not observe any indications that Meadows was incompetent.

[21] Generally, the test for determining competency is whether the defendant has sufficient present ability to consult with defense counsel with a reasonable degree of rational understanding, and whether the defendant has a rational as well as a factual understanding of the proceedings against him. *State v. Davis*, 898 N.E.2d 281, 284 (Ind. 2008).

---

[1] Meadows also asserts that his counsel was deficient by not objecting to the State's misstatement of the standard for competency at the hearing, but he does not develop this argument. Accordingly, this argument is waived. *See Shane v. State*, 716 N.E.2d 391, 398 n.3 (Ind. 1999) (holding that the defendant waived argument on appeal by failing to develop a cogent argument).

[22] We observe that Attorney Darnell filed a Motion for Psychiatric Examination to Determine Competence to Stand Trial and that Meadows acknowledges that Attorney Darnell was correct in moving to withdraw based upon the information in Dr. Hilton's report. Dr. Murphy's report stated that Meadows displayed the capacity to understand the charges against him, had an appreciation of the range and nature of potential penalties, evidenced an appropriate appraisal of the offenses and potential penalties, had knowledge of the role of defense counsel, prosecuting attorney, judge, jury, defendant, and witnesses, and had the capacity to understand trial procedure. While Dr. Murphy's report stated that Meadows's symptoms and major depressive disorder impaired his capacity to assist and cooperate with his attorney and to testify accurately, it also stated that Meadows had not been taking medication that would effectively treat his symptoms, and Meadows does not point to evidence suggesting he was not on medication following his examination and prior to trial. We also observe that Dr. Hilton's report stated that he had no evidence to suggest Meadows would have an impairment in his capacity to disclose information to his attorney or to suggest that Meadows did not have the ability to testify. Dr. Hilton also stated that Meadows had the ability to challenge the prosecution's witnesses and concluded that he did have sufficient ability to consult with his attorney with a reasonable degree of rational understanding.

[23] The record also reveals that, while the trial court initially indicated that it was going to tell the parties what it was inclined to do and that it appeared that

Meadows would benefit from placement at Logansport, after further discussion Meadows stated in part that he was "fully competent to stand trial," and the court engaged in an exchange with him. Petitioner's Exhibit 2 at 5. Moreover, at the post-conviction hearing, the prosecutor asked Meadows's trial counsel if he ever had any concerns regarding Meadows's competency after he began his representation, and trial counsel answered:

> No. It appeared that Mr. Meadows understood the charges against him, understood law, understood the possible penalties, was able to participate in reviewing and preparing evidence and making --- having discussions regarding potential strategies and all that. There were not any issues on my part as to his ability to participate in the trial of his case --- cases.

Post-Conviction Transcript at 35. Further, during cross-examination of Meadows at the post-conviction hearing, the following exchange occurred:

> Q Now, during all that time period, once Mr. Bruner was appointed and you went through essentially two jury trials, did you ever have any concerns about your competency thereafter?
>
> A Not that I felt.
>
> Q Okay, so you were pretty much good to go after, as far as you know? You didn't raise any concerns.
>
> A Yes. Yeah.
>
> Q So you went through two jury trials and in your current state, as you recollect today, you've had no problems, as far as your competency, in assisting your counsel?

A  No.

*Id.* at 44.

[24] Under the circumstances, we cannot say that we are left with a definite and firm conviction that a mistake has been made or that reversal is warranted on this basis.

B. *Trial*

[25] Meadows points to *United States ex. rel. Savory v. Lane*, 832 F.2d 1011 (7th Cir. 1987), for the proposition that the State's use in its case-in-chief and in closing argument of a defendant's pre-custody statement to police that he did not want to talk about the case and did not want to make any statements violated the Fifth Amendment.  Meadows acknowledges that Indiana courts had not squarely addressed the issue at the time of his trial.  He asserts that trial counsel had ample basis to object to the State's use of his refusal to answer questions as substantive evidence against him given the rulings in *Clancy v. State*, 829 N.E.2d 203 (Ind. Ct. App. 2005), *trans. denied*, and *Akard v. State*, 924 N.E.2d 202 (Ind. Ct. App. 2010), *clarified on reh'g*, 928 N.E.2d 623, *summarily affirmed in relevant part by*, 937 N.E.2d 811 (Ind. 2010), as well as the Seventh Circuit holding in *Lane*.

[26] The State contends that trial counsel was not deficient because there was no binding authority in Indiana holding that evidence concerning a defendant's pre-arrest, pre-*Miranda* silence was inadmissible at the time of Meadows's trial

and that several courts in other jurisdictions had indicated that such evidence was admissible. It also asserts, even assuming trial counsel was deficient, Meadows failed to show he was prejudiced given the substantial evidence of his guilt.

In *Clancy*, the court addressed the defendant's argument that the State violated his Fifth Amendment right to silence when, during its case-in-chief, it questioned a police officer regarding his failure to contact the officer to provide his version of the accident while the investigation was ongoing but before Clancy was charged. 829 N.E.2d at 211. At trial, Clancy moved for a mistrial on this basis, which was denied. *Id.* We stated that "[i]t would appear that the State was treading on thin ice" and that "[r]eference to Clancy's pre-arrest silence during the State's case-in-chief was, at best, highly dubious, and the State proceeds at its peril in such situations." *Id.* We observed that the trial court admonished the jury and presumed that the trial court's timely and accurate admonishment cured any error in the State's elicitation of Clancy's pre-arrest silence during its case-in-chief. *Id.* at 211-212.

In November 2010, months after Meadows's July 2010 trial, this Court commented on *Clancy* in *Owens v. State*, 937 N.E.2d 880 (Ind. Ct. App. 2010), *reh'g denied*, *trans. denied*. In *Owens*, we addressed the defendant's argument that the State impermissibly used evidence of his right against self-incrimination guaranteed by the Fifth Amendment as substantive evidence of his guilt. 937 N.E.2d at 885. We observed that the Supreme Court of the United States had not addressed whether a defendant's pre-arrest silence may be used as

substantive evidence and that the federal circuit courts were split on the issue. *Id.* at 886-887. We cited the Seventh Circuit's decision in *Lane*, which is cited by Meadows on appeal, as an example of a federal circuit court that had held that the State's substantive use of a defendant's pre-arrest silence violates the Fifth Amendment privilege against self-incrimination. *Id.* at 887-888. We also stated that "Indiana courts have not squarely addressed the issue" and that the *Clancy* court was not required to make a definitive ruling on the constitutionality of the State's use of the silence. *Id.* at 890. We ultimately held that the very threat that the State may use a person's silence as self-incriminating evidence of guilt at trial places one on the horns of a dilemma during even investigatory proceedings, i.e., whether to make statements that could later be used to incriminate oneself or to remain silent. *Id.* at 891. We emphasized that we did not determine that all pre-arrest, pre-*Miranda* silences were unprotected by the Fifth Amendment and that the holding was strictly limited to the particular facts of that case. *Id.* at 892.

[29] With respect to *Akard*, which is cited by Meadows, the State used the defendant's post-arrest, pre-*Miranda* silence as substantive evidence in its case-in-chief. 924 N.E.2d at 209. The Court observed that the Seventh Circuit had concluded that, even if the defendant testifies at trial, it is a violation of the Fifth Amendment for the State to introduce evidence of the defendant's post-arrest, pre-*Miranda* silence in its case-in-chief. *Id.* (citing *United States v. Hernandez*, 948 F.2d 316, 323 (7th Cir. 1991), *reh'g denied*). The Court concluded that the brevity of the references in comparison to the other

substantial evidence presented to prove the defendant's guilt led to the conclusion that the brief mention of his pre-*Miranda* silence did not rise to the level of fundamental error. *Id.* *Akard* addressed post-arrest silence.

[30] Given that the Supreme Court of the United States had not addressed the issue, the federal circuits were split, *Clancy* did not squarely address or make a definitive ruling on the constitutionality of the State's use of pre-arrest silence, and *Akard* is distinguishable, we cannot say that Meadows has demonstrated a reasonable probability that an objection would have been sustained if made.

[31] We also observe that at the post-conviction hearing, Meadows's trial counsel stated:

> Mr. Meadows had had conversations with the police officers where he had maintained his innocence in these matters. I felt that with --- that at some point in time, a jury would expect that a reasonably prudent person is going to cooperate with the police to some extent, but then say maybe I need to talk to a lawyer.

Post-Conviction Transcript at 28. Further, Meadows's trial counsel argued at trial that Meadows was guilty of lesser offenses and appeared to argue that Meadows was actually being forthcoming by referring the authorities to his attorney. Accordingly, and particularly in light of the defense's approach, we cannot say that trial counsel's performance was deficient. Further, assuming that his trial counsel was deficient, we cannot say that Meadows was prejudiced in light of the strength of the evidence which included the testimony of multiple

officers, Meadows's sister, and Hubble, as well as recordings of Meadows and the discovery of the stolen property in Meadows's trailer.

## *Conclusion*

[32] For the foregoing reasons, we affirm the post-conviction court's denial of Meadows's petition for post-conviction relief.

[33] Affirmed.

Najam, J., and Kirsch, J., concur.